UNITED STATES of America,
Appellee,

v.

The BENSINGER COMPANY, Appellant.

UNITED STATES of America,
Appellee,

v.

The HOBART MANUFACTURING
COMPANY, Appellant.

Nos. 19771, 19777.

United States Court of Appeals,
Eighth Circuit.

June 30, 1970.

Rehearing Denied Aug. 18, 1970.

Lon Hocker, of Hocker, Goodwin & MacGreevy, St. Louis, Mo., and John F. McClatchey, of Thompson, Hine & Flory, Cleveland, Ohio, for appellant, The Hobart Manufacturing Co.; George F. Karch, Jr., of Thompson, Hine & Flory, Cleveland, Ohio, on the brief.

Harold D. Carey, St. Louis, Mo., for appellant, The Bensinger Co.

James M. Gordon, Asst. U. S. Atty., St. Louis, Mo., for appellee; Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., on the brief.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES, and GIBSON, Circuit Judges.

GIBSON, Circuit Judge.

The Hobart Manufacturing Company and one of its St. Louis dealers, The Bensinger Company, were convicted of violating § 1 of the Sherman Act (15 U. S.C. § 1) by conspiring to fix the price of a dishwasher. A timely appeal was filed by both defendants. The facts constituting the alleged conspiracy are as follows.

Trader Vic's restaurant, located in the Bel Air East Motel in St. Louis, Missouri, decided to remodel its dishwashing facilities. Specifications for the remodeling called for the installation of a Hobart dishwasher, plus other equipment, and were prepared by The Bensinger Company. Upon receipt of the specifications, Trader Vic's sent out bid forms to The Bensinger Company, Almar Interior Design and Equipment

Company, and Southern Equipment Company. All of these companies were Hobart dealers located in St. Louis. According to these original bid forms, the companies were to submit bids only for the cost and delivery of the equipment. The restaurant contemplated that its own personnel would handle the installation. Bids were received only from Bensinger and Almar; Bensinger was the low bidder.

Prior to receiving the above bids, the restaurant decided that the equipment supplier should also handle the installation. The first bids were rejected and new bid forms were sent out to the same three companies. The new bid forms required the companies to submit bids specifying the contract price of the equipment as well as costs of installation. Bids were received from Bensinger and Southern. Although Southern's bid on the cost of the dishwasher was the higher of the two, it was ultimately awarded the contract because its total bid was lower.

The alleged conspiracy for which defendants were convicted was a price-fixing agreement on the sale of the dishwasher in the first round of bidding. The testimony was conflicting at the trial, but according to the government's evidence, defendant Hobart's St. Louis dealer representative, Richard Grayless, who was named as a co-conspirator, contacted Almar's officers and told them Hobart would not allow Almar to underbid Bensinger for the job, the job belonged to Bensinger, if Almar bid it would be in danger of losing its Hobart franchise, and if it got the job Hobart would not deliver the machine. When Almar said it was going to submit a bid anyway, Grayless allegedly instructed it to contact Bensinger and find out its bid and then submit a noncompetitive bid. Grayless denied these threats and instructions, but admitted discussing the

job with Almar and also admitted knowledge that Almar was going to send its bid to Bensinger to be forwarded to Trader Vic's. Conversations between Almar and Bensinger followed these discussions with Grayless, the contents of which are disputed, but it is uncontroverted that Almar did forward its bid to Bensinger, which saw it and sent it on to Trader Vic's. According to Bensinger, Almar was simply submitting a courtesy bid to Trader Vic's in order to preserve good relations.

Almar later lost its Hobart franchise and subsequently complained to the United States Attorney. This prosecution followed. Almar was named a co-conspirator, but was not named a defendant.

Appellants raise three issues on appeal. First, they contend that the jurisdictional requirement of interstate commerce was not met in this case and that the judge's instructions on the issue were in error. Second, they contend that the trial court's refusal to permit leading questions in cross-examination of one witness denied them their Sixth Amendment right of confrontation. Third, they object to the admission of certain evidence. We consider these contentions in order.

## INTERSTATE COMMERCE

It is a jurisdictional requirement of the Sherman Act that the acts constituting the violation be "in restraint of trade or commerce among the several States." (15 U.S.C. § 1) In legal parlance, it is said that the restraint must be upon interstate commerce. Appellants contend that the conspiracy fixing the price of one dishwasher is so insignificant that it does not meet the jurisdictional test of interstate commerce. In considering this contention, we must summarize the law applicable to violations of § 1 of the Sherman Act.[1]

---

[1]. It may be well to emphasize here that the discussion on interstate commerce relates only to § 1 of the Sherman Act. Interstate commerce aspects of other sections of the Act, such as § 2 relating to monopolies, as well as provisions of the Clayton Act, involve other considerations.

■ For purposes of § 1 of the Sherman Act, conspiracies which are in restraint of trade may be divided into two categories: (1) those in which the activities complained of are wholly intrastate in character; and (2) those in which the activities occur in the course of interstate commerce. Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732 (9th Cir. 1954), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954); United States v. Pennsylvania Refuse Removal Ass'n, D. C., 242 F.Supp. 794 (1965), aff'd 357 F. 2d 806 (3d Cir. 1966), cert. denied, 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966). Where the activities are of an intrastate character, in order for there to be a Sherman Act violation, it must be shown that the restraint directly and substantially affects interstate commerce. Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2d Cir. 1964); Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167 (8th Cir. 1959), cert. denied 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); Spears Free Clinic v. Cleere, 197 F.2d 125 (10th Cir. 1952); Prospect Dairy, Inc. v. Dellwood Dairy Co., 237 F.Supp. 176 (N.D.N.Y.1964).

■ Where the activities are interstate in nature, the interstate commerce issue depends upon whether the restraint is a *per se* violation of the Act, such as price fixing (United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)) or division of markets (Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899)), or whether the restraint must meet the test of "unreasonableness" (Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911)). Where there is a *per se* violation, the effect upon interstate commerce follows as a matter of law and is conclusively presumed. Las Vegas Merchant Plumbers Ass'n v. United States, *supra*. There need be no showing of the amount of commerce involved and it is no defense that the amount was small. United States v. McKesson & Robbins, Inc., 351

U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1955); Las Vegas Merchant Plumbers Ass'n v. United States, *supra;* United States v. Pennsylvania Refuse Removal Ass'n, *supra*. Where the restraint is not a *per se* violation of the Act, but depends upon the reasonableness of the activity involved, the effect upon interstate commerce may be a question of law, a question of fact, or a mixed question of law and fact. Las Vegas Merchant Plumbers Ass'n v. United States, *supra;* compare Perryton Wholesale, Inc. v. Pioneer Distributing Company, 353 F.2d 618 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L. Ed.2d 208 (1965), with Ruddy Brook Clothes, Inc. v. British & Foreign Marine Ins. Co., Ltd., 195 F.2d 86 (7th Cir. 1952), cert. denied, 344 U.S. 816, 73 S. Ct. 10, 97 L.Ed. 635 (1952).

■ Therefore, the first question to be decided in this case is whether the conspiracy in question to fix prices was intrastate or interstate in character. Appellants contend that since the Hobart dealer representative was located in St. Louis, the franchised dealers were located in St. Louis, the buyer was in St. Louis, the agreement was entered into in St. Louis, and the dishwasher was to be installed in St. Louis, the conspiracy must be viewed as one wholly intrastate in character. We think this analysis of the transaction overlooks several significant aspects. It is true that the mere fact that a party engages in interstate commerce will not support a finding that a restraint of trade occurred in interstate commerce; the interstate commerce itself of that party must be involved. Lieberthal v. North Country Lanes, Inc., *supra*. But in this case, the interstate business of Hobart was directly involved in several ways. The machine which was the subject of the agreement was manufactured in Troy, Ohio, and it had to be delivered from there to St. Louis. The order from St. Louis had to be placed and accepted in Hobart's main office in Troy. Most significantly, one of the threats which led to the agreement was that if Almar got the

contract Hobart would not deliver the machine. Thus, the conspirator Hobart was engaged in interstate commerce, its product which was the subject of the conspiracy moved in interstate commerce, and that movement in interstate commerce was directly threatened by the conspiracy. This is sufficient to establish that the conspiracy occurred in the course of interstate commerce. Since the conspiracy was not intrastate in character, the requirement of that theory that the effect on interstate commerce be direct and substantial is not applicable here.[2]

■■ With an "in commerce" transaction, it must be determined whether the conspiracy was a *per se* violation of the act, which requires no further showing of an effect upon interstate commerce, or whether it was a restraint which must meet the test of unreasonableness. The agreement in question was that Almar would not submit a bid lower than that of Bensinger. The only subject of the first round of bids was the price of the dishwasher and its delivery. This is a price-fixing agreement of the simplest kind, and price-fixing agreements are *per se* violations of the Sherman Act. Therefore, it is immaterial that the amount of interstate commerce involved is small.[3] United States v. McKesson & Robbins, *supra*; United States v. Socony-Vacuum Oil Co., *supra*.

■ It may well be that this case represents the *reductio ad absurdum* of the proposition that price-fixing agreements are to be condemned as *per se* violations. The subject of the conspiracy was only one dishwashing machine, and the price at which this $10,000 machine

was fixed was only $107 above the dealers' cost. Nevertheless, this court is not willing to say that large price-fixing conspiracies in interstate commerce are violations of the Act, while little ones are not; the law condemns them all. If the defendants chose to enter into the conspiracy, they cannot complain because the Government chose to prosecute.

Appellants' contention that because there was no sale resulting from the first round of bids, there was no effect upon interstate commerce so as to establish jurisdiction under the Sherman Act, merits only brief consideration.

■ For purposes of a *per se* violation of the Act, the conspiracy need only occur in interstate commerce, for the conspiracy itself constitutes the restraint on trade. The fact that the conspiracy was a failure and did not bear fruit does not preclude jurisdiction to punish the conspiracy. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224, n. 59, 252, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Plymouth Dealer's Ass'n v. United States, 279 F.2d 128 (9th Cir. 1960); United States v. Central States Theatre Corp., 187 F.Supp. 114 (Neb. 1960).

We turn now to the question of whether the trial court's instructions upon the issue of interstate commerce were adequate in view of the principles of law we have just discussed. In order to determine whether these instructions were proper, it will be necessary to review the presentation of the case at trial and specify the questions which are properly to be determined by the trier of fact.

2. If the conspiracy were one involving only Bensinger and Almar, we would have a different case, for then there would be a more difficult question as to whether the conspiracy occurred in the course of interstate commerce; we might then be faced with the question of whether this was an intrastate conspiracy which substantially affected interstate commerce. However, the involvement of Hobart directly as a conspirator changes the whole complexion of the conspiracy.

3. In the interests of clarity, it may be repeated that this conclusion follows only because we have found that the conspiracy occurred in interstate commerce. Were the price-fixing agreement to have occurred in intrastate commerce, it would be necessary to show a substantial impact upon interstate commerce. It is not necessary here to consider what that test might be.

It is not clear from the transcript exactly what theory the Government proceeded on at the trial. On appeal the Government contends that it has proved its case upon either theory: (1) that it was an intrastate conspiracy which substantially affected interstate commerce; or (2) that it was a conspiracy in the course of interstate commerce. Under the view we have taken of the case, the Government established its case only on the latter theory. Under the former theory, the question of whether there was a substantial effect upon interstate commerce is a question of fact for the jury, and as will appear from the discussion below, there was no adequate instruction on this theory given to the jury. However, if the instructions were adequate on the latter theory the Government is entitled to its judgment.

On this point, the case of Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732 (9th Cir. 1954), is directly in point:

> "There remains the question as to whether the appellants suffered any prejudice through the failure to instruct on the 'affect commerce' theory, relied on by the Government. * * *

> "This is a case where the Government proceeded on two alternate theories relating to (1) matters complained of in the flow of commerce, and (2) matters complained of in intrastate commerce substantially affecting interstate commerce after the flow in commerce had ceased. Either theory properly presented to the jury would support a conviction on the facts of this case." (*Id.* at p. 748)

 The Court's charge to the jury in the present case on the interstate commerce element was as follows:

> "An essential element of the offenses prohibited by the Sherman Act is that the defendants' alleged unreasonable restraint must involve interstate commerce. The term 'interstate commerce' includes transactions of commodities moving across state lines, or in the flow of interstate commerce after their journey has commenced and until it is terminated, as well as entirely intrastate transactions which substantially affect interstate commerce.

> "It is a question of fact for the jury to determine whether defendants' conduct involved such interstate commerce in the light of business practices. In cases involving products moving across state lines, or in the flow of commerce it is not material how much commerce is involved. The Sherman Act brands as unlawful any contract or combination or conspiracy which would operate to restrain unreasonably any interstate trade and commerce, regardless of how small in amount or value.

> "Certain types of conduct are regarded as unreasonable per se. This means that the mere doing of the act itself constitutes an unreasonable restraint on interstate commerce, and it is not necessary to consider why the acts were committed, or their effect on the industry, or any other explanatory matter. Conduct regarded as unreasonable per se includes submitting collusive bids and price quotations by agreement."

This charge accurately described the law relating to violations of the Sherman Act which occur in the course of interstate commerce. It is of course a question of fact for the jury to determine whether the conspiracy occurred in the course of interstate commerce. The instructions specifically recognized that the jury must make the determination of whether the conspiracy "involved" interstate commerce, and defined that term as including "transactions of commodities moving across state lines, or in the flow of interstate commerce * * *." That instruction was accurate and encompassed the commodity involved here, the dishwasher. As discussed above, where the conspiracy occurs in interstate commerce, if there is a *per se* violation of the Act, the effect upon interstate commerce follows as a matter of

law, and the instructions adequately stated this principle.

Appellants maintain that the court should have instructed the jury that it must find as a fact that the actions affected interstate commerce, and the *per se* violation itself must have affected that commerce. The *Las Vegas Merchant Plumbers* case is again directly in point on this contention:

> "Appellants argue that the effect on interstate commerce of the acts complained of, must be substantial. They contend also the question of substantiality should have been submitted to the jury. The question should have been submitted on the 'affect commerce' theory. But we are now concerned with only the 'in commerce' theory remaining in the case.
>
> "The test of the impact on commerce is qualitative not quantitative * * * '§ 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected.' United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225, ft. note 59, 60 S.Ct. 811, 84 L.Ed. 1129 * * *.
>
> " * * * The jury found by its verdict that the defendants * * * had engaged in * * * violations per se 'flowing' in the stream of interstate commerce. The proscribed and substantial effect of these illegal acts followed as a matter of law." (Citations omitted.) Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d at 748.

We find no error in the instructions given in this case.

## CROSS-EXAMINATION OF WITNESS

Barry Burlis, employed by Hobart as a dealer representative, was called to testify as a government witness. In the course of his testimony, the trial court ruled that he was a hostile witness to the Government and permitted government counsel to ask him leading questions. On cross-examination, Hobart's attorney sought to lead Burlis, and upon the Government's objection, the trial court ruled that he was not hostile to Hobart because he was a Hobart employee and Hobart could not lead him. Hobart views this ruling as a denial of its Sixth Amendment right to confront a witness. As authority for this contention, Hobart cites Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

The *Douglas* case established that "a primary interest secured by the Confrontation Clause of the Sixth Amendment is the right of cross-examination." (p. 418, 85 S.Ct. p. 1074). Therefore, we must decide whether the trial judge's ruling in the instant case denied the defendant an effective opportunity for cross-examination.

The extent of cross-examination and the restriction of the use of leading questions rest in the sound discretion of the trial court. Glasser v. United States, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Durham, 319 F.2d 590 (4th Cir. 1963); Mitchell v. United States, 213 F.2d 951, 956 (9th Cir. 1954), cert. denied, 348 U.S. 912, 75 S.Ct. 290, 99 L. Ed. 715 (1955); Stahl v. United States, 144 F.2d 909 (8th Cir. 1944). The exercise of the trial court's discretion will not be reversed unless there is a clear abuse of discretion and prejudice to the defendant. In the instant case, we find neither an abuse of discretion nor prejudice to the defendant, much less the denial of a constitutional right.

The testimony in question related to Burlis's function in quoting prices of Hobart products to dealers. On direct examination, Burlis, in response to a leading question posed by the Government, testified that he made quotations guaranteeing prices for a certain period of time. On cross-examination, the Hobart attorney explored this matter further and it was on this subject that the controverted ruling was made. Nevertheless, Hobart was able to ask the witness several questions about his function in quoting prices which the witness answered, and it does not appear that

his testimony was in any way incomplete on the subject. Hobart did not make an offer of proof at the trial and does not indicate on appeal why the denial of the right to ask leading questions prevented it from eliciting any necessary or relevant information. Furthermore, it does not appear that Burlis's testimony on direct or cross-examination was in any way prejudicial to Hobart.

Thus the facts in the instant case are materially different from those in *Douglas, supra,* relied on by Hobart. In that case, the Government called as a witness one Loyd who had previously been convicted of the same crime with which Douglas was charged. Loyd refused to testify on any matter whatsoever connected with the case, relying on the Fifth Amendment privilege against self-incrimination. In its examination the Government read to the witness an alleged confession made by him which contained a great deal of material prejudicial to the defendant. The *Douglas* case held that the introduction of the confession in this form violated the defendant's right to confront the witness because Loyd's refusal to testify prevented any cross-examination of the witness whatsoever. Here the witness freely testified as to the matters he was questioned about, and there was no apparent prejudice to the defendant in his testimony. Thus *Douglas* is inapplicable. We conclude that there was no error in the trial court's ruling.

### THE PEERLESS INCIDENT

The Government was permitted at trial to introduce evidence of a circumstantial nature that the Peerless Supply Company had been cut off by a Hobart dealer representative from a discount on Hobart parts that it had previously enjoyed. Barry Burlis, employed by Hobart as a dealer representative, was called as a government witness and testified as to the duties of his position. He testified that his duties were primarily of two sorts. First, he promoted the sales of Hobart equipment by calling on architects and potential customers and en-

couraging them to utilize Hobart equipment. However, he was not allowed to sell Hobart equipment directly to these customers, and any sales engendered by his promotional activity were channeled through authorized dealers. Secondly, he assisted Hobart dealers by quoting them current prices on Hobart equipment and in certain cases expediting orders. He testified he was not authorized to raise or lower prices that were set by the main office in Troy, Ohio, he had nothing to do with the sales of parts, he had not met Lewis Leabman of Peerless Supply prior to the trial, and he had never had a conversation with him on any subject.

The president of Peerless Supply Co., Leabman, was called by the Government and testified that in January 1968, some five months after the conspiracy in question, Peerless was denied a previously enjoyed 15 per cent discount on the list price in the purchase of Hobart parts. He was permitted to testify over defendants' objection that Burlis told him over the telephone that he, Burlis, was cutting off Peerless' discount on parts because Peerless underbid Hobart dealers on a job at the Pattonville High School. Peerless is not, and had never tried to become, a Hobart dealer. This testimony was corroborated in part by a Peerless saleswoman who testified over defendants' objection that she had seen a sign in the parts section of Hobart's building saying "Don't sell to Peerless."

This testimony was, of course, hearsay as to Hobart and Bensinger, as well as to Burlis, and there is no question it was highly prejudicial to defendant Hobart and also to defendant Bensinger, who was not involved in the incident at all. The issue then is whether there was a proper basis for its admission and whether its relevance to the factual issues in the case outweighs its prejudicial effect.

 It is a well-established principle of criminal law that evidence of other criminal acts of a defendant may not be introduced to prove his general

propensity to commit crimes of the nature charged. The reasons for this rule are extensively discussed in Kempe v. United States, 151 F.2d 680, at pp. 687–689 (8th Cir. 1945), and need not be detailed here, but the facts of that case well illustrate the application of the rule. In that case, defendant was charged with selling gasoline during W. W. II at prices above the maximum established under the Emergency Price Control Act. As part of its case, the Government introduced evidence of sales by the defendant above the controlled price for which he had not been charged. This evidence was held to have been improperly admitted. The rule has been applied in a civil action for antitrust violations under the Clayton Act which under certain limited circumstances permits use of prior judgments obtained by the government in criminal convictions. International Shoe Machinery Corp. v. United Shoe Machinery Corp., 315 F.2d 449, 459–460 (1st Cir. 1963), cert. denied, 375 U.S. 820, 84 S.Ct. 56, 11 L.Ed. 2d 54 (1963). It is evident from this position that the government's evidence on the Peerless incident would not be admissible to prove Hobart's general propensity to suppress competition among its dealers. Hobart was not charged with a general conspiracy to suppress such competition nor was the Peerless incident charged as a criminal offense in this case.

■■■■ Of course, evidence of other criminal activity of a defendant may be introduced if it is relevant to a specific factual issue in the case, and if it is so closely connected with that issue that its relevance outweighs its prejudicial effect. In this case, the Government contends on appeal that the evidence of the Peerless incident was admissible on the grounds that it shows the authority of Grayless to enter into the conspiracy charged and to bind the corporation by his actions. The Government in its brief argues:

"The only proof available was what a dealer representative like Grayless had, *in fact* done in situations similar to the offense charged in the indictment. * * * The Peerless matter itself was offered to show the existence and *actual use* of that delegated authority which would make Hobart liable for those acts by Grayless which were alleged in the indictment." (emphasis added.)

In considering the competence of this evidence, it must be kept in mind that the only proof offered of the Peerless incident was hearsay testimony, and for such hearsay to be competent to prove the facts of the transaction, an adequate foundation for its introduction must be laid.

The hearsay was introduced to prove Burlis's authority as a Hobart dealer representative and by extension to prove Grayless' similar authority at an earlier time. Three questions are raised by this proof. First, was the incident in question one in which Burlis was acting as an agent of the Hobart Company? Two, if so, can the scope of an agent's (Burlis's) authority be proved by his own hearsay admission? Three, was the statement admissible to prove that Burlis had in fact cut off Peerless with Hobart's authorization?

■■■ It is a universally accepted rule of evidence that the fact of agency may not be proved by the alleged agent's extra-judicial statements. Walmsley v. Quigley, 129 F. 583 (8th Cir. 1904); 4 Wigmore on Evidence, § 1078 (3d ed. 1940); A.L.I. Res. on Agency 2d, § 285 (1958). In applying this principle to the instant case, it may be noted that the employment of Burlis by Hobart is undenied. Burlis denied however that he had any authority with respect to the sale of parts, denied that he had ever had anything to do with the sale of parts, and denied ever having any dealings with Peerless. The Government did not introduce any evidence showing that Burlis had ever conducted any business of Hobart's connected with the sale of parts. The testimony by Leabman did not reveal any dealings between Leabman and Burlis, prior to the contro-

versial phone call, which would establish any reliance on Leabman's part that Burlis was an authorized Hobart agent in respect to this transaction. No reason was given by Leabman as to why he called Burlis with respect to the denial of the discount. Furthermore, the hearsay statement recounted by Leabman in no way indicated that Burlis was acting on behalf of Hobart rather than himself. In the light of this evidence, there was no sufficient basis for the admission of the hearsay phone call as proof of Burlis's agency in this matter.

■ Even if, however, we were to overlook the inadequacy of the Government's proof on the fact of agency, and to admit for purposes of argument that Burlis did make the statement attributed to him, the question remains whether the statement was admissible against Hobart as proof of the extent of the agent's authority. We conclude that it was not.

The governing principle of law is set forth in § 285 of the Second A.L.I. Restatement on Agency:

"Evidence of a statement by an agent concerning the existence or extent of his authority is not admissible against the principal to prove its existence or extent, unless it appears by *other evidence* that the making of such statement was within the authority of the agent, or as to persons dealing with the agent, within the apparent authority or other power of the agent." (emphasis added.)

This statement is in accord with our own decision in Walmsley v. Quigley, *supra,* and decisions in other circuits. Flintkote Co. v. Lysfyord, 246 F.2d 368 (9th Cir. 1957), cert. denied 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); Franhan Distributors, Inc. v. New York World's Fair, 124 F.2d 82 (2d Cir. 1941), cert. denied 316 U.S. 687, 62 S.Ct. 1277, 86 L.Ed. 1759 (1942); Durant Motor Co. v. Georgia-Florida Motor Co., 18 F.

2d 95 (5th Cir. 1927). It may be noted that the *Walmsley* case, as well as the other cases, seem to suggest that the hearsay statement itself would not be admissible to prove the scope of Burlis's authority even if other evidence were introduced. *See* Annotation, "Competence, as against Principal, of Statements by Agent to Prove Scope, as Distinguished from Fact, of Agency," 3 A.L.R.2d 598 (1949). In any event, as detailed above, there was no such "other evidence" offered by the Government in this case. Therefore, there was no proper foundation for the introduction of this statement as proof of the extent of Burlis's authority.

■ Statements by an agent are admissible against the principal to prove the truth of the facts asserted therein, only if he was authorized to make those statements. A.L.I. Res. of Agency 2d, § 286 (1958). This of course was one of the primary issues in this case—whether Grayless had the authority to make the statements he allegedly did. It is clear from the above discussion that there was no proof of Burlis's authority, and therefore the statement was not admissible against Hobart to prove that Burlis actually cut off Peerless.

By only one hearsay statement, which was denied in court, the Government seeks to establish the fact of Burlis's agency in the alleged Peerless transaction, the extent of his authority in that transaction, and its actual use so as to bind Hobart on Grayless' acts committed some five months prior to the Peerless incident. The proffered testimony is incompetent for any of these purposes. It goes without saying that the testimony was incompetent to prove Grayless' authority, and since it was indisputably prejudicial to the defendants, its admission requires reversal.

■ Although the Government does not now contend that the testimony is admissible as impeachment of Burlis, it was admitted on that theory at the trial[4]

---

4. The trial court also held the evidence admissible on a later objection, on the basis that it showed intent. Intent was not an issue in the case. The act of

and it may be well to dispose of this possibility briefly. If the hearsay were admitted as impeachment, it would only go to prove that Burlis made the statement attributed to him and thus to impeach his credibility; it would not prove that the facts of the incident actually occurred or that Burlis had the authority to do what he is alleged to have done. Hence the testimony could not by extension go to prove the authority of Grayless. Since its use in this form would be highly remote from any issue in the case (Burlis is not in any manner connected with the charged conspiracy), its prejudicial effect should preclude its admission. Furthermore, since the hearsay in this form is on a collateral issue, its denial by Burlis in direct testimony would be conclusive. 98 C.J.S. Witnesses § 611.

Reversed and remanded for a new trial.

price rigging in interstate commerce was a *per se* violation of the Act and intent would be immaterial. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209.