**YELLOW CAB COMPANY OF NEVADA, a Nevada corporation, Appellant,**

v.

**CAB EMPLOYERS, AUTOMOTIVE & WAREHOUSEMEN, LOCAL #881, et al., Appellees.**

**No. 25567.**

United States Court of Appeals, Ninth Circuit.

March 1, 1972.

Rex A. Jemison (argued), of Singleton, Beckley, Delanoy, Jemison & Reid, Las Vegas, Nev., for appellant.

Madison B. Graves (argued), of Graves, Crawford & Phillips, Ltd., George Rudiak (argued), Las Vegas, Nev., for appellees.

Before CHAMBERS and WRIGHT, Circuit Judges, and BYRNE,* District Judge.

WILLIAM M. BYRNE, Senior District Judge:

Pursuant to the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq., appellant Yellow Cab Company of Nevada (Yellow Cab) brought suit in United States District Court to recover nearly $4,000,000 in damages, actual and treble, for alleged conspiracies to restrain trade and to monopolize, violations of Sections 1 and 2, respectively, of the Sherman Act. The District Court first denied, but upon reconsideration, granted, appellees'[1] joint Motions for Summary Judgment. In granting these motions, the District Court expressly found that there was no genuine issue as to any of the jurisdictional facts upon which its subject-matter jurisdiction depended and that appellees were entitled to judgment as a matter of law. Now before this court, Yellow Cab maintains that the lower court's assessment of federal jurisdiction was incorrect.

In its complaint, Yellow Cab sought recovery by way of two theories, namely, an "in commerce" violation of the Sherman Act and a violation of the Sherman Act which "affected commerce."

A. In Interstate Commerce.

■ In part, Yellow Cab claimed that it was engaged in interstate commerce because pursuant to an exclusive contract with Union Pacific Railroad, it transported passengers from the interstate terminal at the railroad depot to the interstate air terminal at McCarran Field, located in Clark County, Nevada. Additionally, Yellow Cab held a permit from the California Board of Equalization which authorized it to transport passengers to Nevada from California and vice versa.

These activities, which accounted for an annual revenue of approximately $8,500.00, constituted only .5% of Yellow Cab's over-all business ($2,313,096.-15). The trial judge held that Yellow Cab's interstate taxicab operations were so insignificant in scope as to be *de minimis* to its over-all business enterprise.

Appellees concede that certain aspects of Yellow Cab's business may be regarded as "interstate [in] character." Nevertheless, they maintain that the Sherman Act is without applicability to this case because Yellow Cab's interstate activities are "infinitesimal" in scope. In-

---

* Honorable William M. Byrne, United States Senior District Judge, Central District of California, sitting by designation.

1. The appellees are Cab Employees, Automotive & Warehousemen, Local No. 881 (the Union), C. A. Christmas and Richard Thomas. individually, and as President and Secretary-Treasurer, respectively, of the Union, and Victor Whittlesea, individually, and doing business as Whittlesea Blue Cab Company (Whittlesea).

deed, they particularly note that Yellow Cab's contractual arrangement to transport passengers from interstate terminal to interstate terminal contributes, in effect, only a "percentage of a percentage" to its over-all revenue. Accordingly, appellees argue that the district court did not err when it deemed Yellow Cab's interstate business to be *de minimis* to its intrastate activity.

In United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), the court held that transporting passengers between so-called "interstate terminals" was "clearly a part of the stream of interstate commerce." Here, a slight portion of Yellow Cab's business activity consisted of such passenger transportation. Although such activity amounts to only a tiny fraction of its business, Yellow Cab maintains this is sufficient participation to invoke the protection of the Sherman Act. The basis of Yellow Cab's position is the well-settled rule that where the activities are interstate in nature, a *per se* violation of the Sherman Act presumes, as a matter of law, an effect upon interstate commerce, thus negating a showing of the amount of commerce involved. Under such circumstances, it is no defense that this amount may be small. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); Las Vegas Merchant Plumbers Association v. United States, 210 F.2d 732 (9th Cir. 1954), cert. denied 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954). Yellow Cab argues that it comes within the purview of this "well-settled rule" because it alleged the appellees conspired "to divide the market," an action which this court has deemed a *per se* violation of the Sherman Act. Las Vegas Merchant Plumbers Association v. United States, supra.

In the main, appellees base their opposition to Yellow Cab's "in commerce" theory on the jurisdictional formula worked out by this court in Page v. Work, 290 F.2d 323, 330, (9th Cir. 1961), cert. denied, 368 U.S. 875, 82 S. Ct. 121, 7 L.Ed.2d 76 (1961): "The test of jurisdiction is not that the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business." There, the defendants were charged with conspiring to eliminate the "Los Angeles Daily Journal" as a competitor in the field of legal advertising in Los Angeles. Although both the defendants and the Journal were engaged in some form of interstate commerce, the court held that it was not an "in commerce" case because the conspiracy was directed at the local legal advertising market.

Yellow Cab acknowledges the viability of the *Page* formula, but argues that it is without applicability to this controversy. Specifically, it is pointed out that in *Page* the plaintiff continued to purchase newsprint and carry national news and advertising and mailed copies of its newspapers to its 13 out-of-state subscribers. By contrast, here, all of Yellow Cab's activities, interstate and intrastate, were interrupted by the alleged conspiracy.

In our view, Yellow Cab seeks to avoid the "well-settled" rule regarding *per se* violations of the Sherman Act by tailoring the thrust of the alleged conspiracy to come within general principles of antitrust law. Although it is true that the courts have held that a small amount of interstate commerce is sufficient to obtain federal jurisdiction, they have done so when the nature of the conspiracy has been *directed against interstate commerce*. Illustrative of this point is the recent case of United States v. Bensinger Co., 430 F.2d 584 (8th Cir. 1970). There, the defendants were convicted of violating Section 1 of the Sherman Act by conspiring to fix the price of a *single* dishwasher. The background of this alleged conspiracy is this: A St. Louis, Missouri, restaurant decided as part of the remodeling of its dishwashing facilities to install a Hobart dishwasher. Bid forms were sent to three St. Louis area Hobart dealers, only two of which expressed interest in the project. After

its receipt of this form, one of these companies, Almar, was purportedly contacted by Hobart's St. Louis representative and told that it was not to underbid Bensinger. Almar was warned that its Hobart franchise would be in jeopardy if it submitted the low bid. Indeed, the representative warned that if Almar were awarded the contract, the dishwasher would not be sent from the home office. Thereafter, Almar submitted a perfunctory bid and the contract went to Bensinger.

The defendants maintained that the conspiracy to fix the price of one dishwasher was so insignificant that it did not meet the jurisdictional test of interstate commerce. The court disagreed, noting that the dishwasher had to be shipped from out of state (Troy, Ohio, to St. Louis, Missouri) and that the order to obtain the machine had to be placed and accepted in Hobart's main office in Troy. Of even greater significance was Hobart's threat not to deliver the dishwasher if Almar were awarded the contract. Thus, in the words of the court, ". . . the conspirator Hobart was engaged in interstate commerce, its product *which was the subject of the conspiracy* moved in interstate commerce, and that movement in interstate commerce was directly threatened by the conspiracy. This is sufficient to establish that the conspiracy occurred in the course of interstate commerce." (Emphasis supplied). 430 F.2d at 589. The court, nevertheless, noted the following clarification of its decision: "In the interests of clarity, it may be repeated that this conclusion follows only because we have found that the conspiracy occurred in interstate commerce.

In the case at bar, Yellow Cab maintains that the purpose of the conspiracy was to produce "a long strike in the entire taxicab industry leaving co-conspirator Whittlesea as the only taxicab operator in Clark County." Given the miniscule amount of business generated by Yellow Cab's interstate activity, it is readily apparent that intrastate business "was the subject of the conspiracy." The subject matter of the conspiracy is important because it adds dimension to the "well-settled" rule. As indicated, in *Yellow Cab Co.*, and *Las Vegas Merchant Plumbers Association*, as well as in *Bensinger*, the alleged conspiracies were directed at interstate commerce. Here, the conspiracy alleged by Yellow Cab was not directly aimed at that portion of its activity which involves interstate commerce: the appellees were not seeking to gain control of the terminal-to-terminal market, but to dominate the intrastate business activity. Under these circumstances, we find no merit in the "in commerce" theory propounded by Yellow Cab.

**B. Effect on Commerce.**

■ As already noted, Yellow Cab contends in the alternative that the Sherman Act was appropriate because the alleged conspiracy substantially affected interstate commerce.[2]

At the time in issue, the Nevada Public Service Commission did not regulate the number of taxicab units which operated in Clark County. Instead, it maintained a *laissez faire* policy by letting the units be determined by the economic laws of supply and demand and free competition among the holders of operating permits. Under this system, Yellow Cab was able to secure approximately 35 percent of the Clark County taxicab market, while Whittlesea maintained approximately 20 percent thereof.[3]

2. The Sherman Act is not violated when the activities are intrastate in character unless it can be shown that interstate commerce has been substantially affected thereby. Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2d Cir. 1964); Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167 (8th Cir. 1959).

3. The "system" maintained its stability by adhering to the terms of a contractual agreement between the taxicab operators and the Union. Under this agreement, any cab company which produced in excess of a guaranteed minimum could place additional taxicabs in operation. In the reverse, any company producing less than

The contract which bound the operators and the union included a proviso which penalized any operator who operated more taxicabs than allowed under the agreement. The nature of this penalty was to impose upon the offending taxicab operator payment of a minimum wage of $20.00 per day rather than the "normal" wage of $16.00 per day. Appellee Whittlesea was found to be in violation of the agreement, and as a consequence was required by an arbitration board to pay its drivers $20.00 per day for a period of 90 days. Whittlesea estimated that the punishment meted out by the board would result in a business loss of approximately $108,000.00.

Seeking to stave off such disastrous consequences, Whittlesea, allegedly, concocted a conspiracy with the union which manifested itself in the form of a contract providing that the minimum wage to be paid drivers was $20.00 per day. The contract, which purportedly increased Whittlesea's share of the taxicab market to 29½% by "dividing" the market, was to become effective only when it had been executed by any combination of companies which as an aggregate, employed 80 percent of all Clark County drivers. None of the major cab companies would agree to the terms of this contract, thus resulting in a strike which lasted for 9 months.

Yellow Cab argues that this local conspiracy had a substantial impact upon interstate commerce. According to Yellow Cab, taxi service to and from McCarran Field, which is the airport serving Las Vegas, was impaired by the conspiracy and the prolonged strike which resulted therefrom. As stated by Yellow Cab, "Interstate travellers were required to walk, carrying their baggage from the interstate air terminal, . . . . out to the highway in order to obtain bus service . . . [Additionally], . . . there were an insufficient number of taxicabs to service the interstate travellers, and they were required to ride in courtesy cabs . . . During the final stages of the strike, there was a period of violence in which Appellant's drivers and interstate passengers were assaulted and intimidated." The district court held that the conduct said to be in violation of the Sherman Act only affected intrastate business activity, thus denying it jurisdiction to grant any relief.

Yellow Cab asserts that the sense of disruption which permeates its allegations is comparable to the situation in Eastman v. Yellow Cab Co., 173 F.2d 874 (7th Cir. 1949). With this assertion, we disagree. There, the court held that allegations that a taxicab shortage existed because of the conspiratorial efforts of the City of Chicago and the established cab operator to have enacted a new licensing ordinance were held sufficient to state a claim under the Sherman Act, because the shortage burdened "the journeys of interstate passengers, and that such burdens result(ed) from the alleged conspiracy."

In the instant case, it is uncontroverted that no plane flight in or out of Las Vegas was delayed or cancelled as a result of the alleged conspiracy and the "prolonged strike." Similarly, it is readily acknowledged by Yellow Cab that no interstate passenger was prevented from reaching his destination. The "only contention" it makes is that these passengers were "seriously inconvenienced." Nevertheless, in its allegations it admits that during the strike "courtesy cabs" were provided and that Whittlesea had increased the number of taxicabs it had in service. Also, two other companies, Ace and Union signed the contract in issue and went back into operation. The taxicab service was supplemented by limousine service, bus service each half-hour and rent-a-car agencies. In sum, the amount of transportation available to the interstate traveler [4] during the

the minmum guaranty was required to reduce its taxicab units.

4. The strike-related violence occurred some two and one-half months after Yellow Cab filed its antitrust complaint. Accordingly, it appears to be beyond the scope of the specific allegations raised in the pleadings. In any event, there is no indica-

course of the strike, coupled with the fact that interstate air service operated without interruption during the period of the dispute, satisfy us that there is no factual basis to support Yellow Cab's "affect commerce" theory.

Affirmed.

---

tion that the violence so disrupted transportation to and from the airport as to have constituted a substantial burden on interstate commerce.