782 F.2d 1044
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
MYRON R. RUGGLES, Defendant-Appellant.
 85-3181
 United States Court of Appeals, Sixth Circuit.
 12/23/85
 
 BEFORE: JONES and WELLFORD, Circuit Judges, and DeMASCIO, District Judge.*
 PER CURIAM.
 
 
 1
 Appellant, Myron R. Ruggles, was convicted by a jury of violating the Sherman Act, 15 U.S.C. Sec. 1. He was charged and convicted for his involvement in a single conspiracy to rig bids in the Youngstown-Warren County, Ohio area. Appellant now contends that we should reverse his conviction, either by granting his motion of acquittal or by giving him a new trial because there was insufficient evidence to support the verdict and because of a fatal variance between the indictment charge and the proof adduced at trial. Appellant also claims that the district court lacked subject matter jurisdiction because the alleged criminal conduct did not involve interstate commerce. Finally, two peripheral issues are raised as error, involving an alleged Brady violation and an alleged abuse of discretion by the trial court regarding discovery.
 
 
 2
 Ruggles was indicted on one count of conspiring to rig bids on electrical contracting projects.[1] The indictment charged appellant and others, in part:
 
 
 3
 10. Beginning at least as early as the summer of 1979, and continuing at least until August 1981, the exact dates being unknown to the Grand Jury, the defendants and co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce, in violation of Section 1 of the Sherman Act (15 U.S.C. Sec. 1).
 
 
 4
 11. The aforesaid combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the defendants and co-conspirators, the substantial terms of which were:
 
 
 5
 (a) to allocate among themselves various electrical construction projects in the Youngstown-Warren area;
 
 
 6
 (b) to fix the prices at which various electrical construction projects in the Youngstown-Warren area were bid; and
 
 
 7
 (c) to submit noncompetitive, collusive, complementary and rigged bids, or to refrain from bidding, for various electrical construction projects in the Youngstown-Warren area.
 
 
 8
 Prior to trial, the government set out seven electrical construction projects allegedly involved, stating that the conspirators had successfully rigged bids on six. As unindicted coconspirators, the government named six electrical contracting firms and six individuals.
 
 
 9
 During the alleged conspiracy, Ruggles was vice president of Yobe Electric, Inc., a construction firm operating in the area, and he was asserted to be the central figure. There was proof that at one meeting of conspirators, appellant stated that the primary purpose of the bidrigging arrangement was to give 'a contractor the opportunity to, once in a while, obtain a job and that you wouldn't get every job this way, but the jobs that you got this way and other jobs that you would get through the normal course of business, would end up giving you a profitable year.' The government sought to prove that the parties involved, particularly Ruggles, consulted with each other prior to submitting bids, allocated projects among themselves, and submitted collusive bids.
 
 
 10
 Ruggles acted as mediator between companies that could not agree on the bidrigging, and in other instances, appellant actively sought to rig bids. Occasionally, appellant gave the names of the other bidders and offered to transmit an individual's bid to other bidders. In the majority of the projects, the agreed upon party was the successful bidder. The scheme failed twice, however, when outsiders submitted unexpected lower bids. Ruggles' employer, Yobe Electric, won only one of the projects involved.
 
 
 11
 To sustain the conviction, viewing the evidence in a light most favorable to the government, substantial evidence must support the jury determination of appellant's guilt on the conspiracy charged in the indictment. Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Chandler, 752 F.2d 1148 (6th Cir. 1985). In determining whether the jury's verdict is supported by substantial evidence, we do 'not sit as a trier of fact and may not enter into a de novo consideration of the evidence.' United States v. Ayotte, 741 F.2d 865, 867 (6th Cir.), cert. denied, 105 S. Ct. 574 (1984). We must determine whether the conspirators had a common design or objective underlying their separate acts as charged. Blumenthal v. United States, 332 U.S. 539 (1947); United States v. Lester, 282 F.2d 750, 753 (3d Cir. 1960), cert. denied, 364 U.S. 937 (1961). Accord Braverman v. United States, 317 U.S. 49, 53 (1942).
 
 
 12
 The gist of a conspiracy--the agreement among the participants--'may continue over an extended period of time and involve numerous transactions.' United States v. Boyd, 595 F.2d 120, 123 (3d Cir. 1978). 'Proof of some kind of formal agreement is not necessary to establish a conspiracy . . ..' United States v. Ayotte, 741 F.2d at 867. Rather, a conspiracy may be inferred from a course of conduct or business dealings (id.; American Tobacco Co. v. United States, 328 U.S. 781, 809-810 (1946)), and once established, a conspiracy is presumed to continue, until its termination is affirmatively shown. United States v. Portsmouth Paving Corp., 694 F.2d 312, 318 (4th Cir. 1982); United States v. Basey, 613 F.2d 198, 202 (9th Cir. 1979), cert. denied, 446 U.S. 919 (1980); United States v. Cirillo, 468 F.2d 1233, 1239 (2d Cir. 1972), cert. denied, 410 U.S. 989 (1973); Poliafico v. United States, 237 F.2d 97, 106 (6th Cir. 1956), cert. denied, 352 U.S. 1025 (1957). The presumption is not destroyed by the failure of the government to offer proof of the conspiracy's uninterrupted or continuous existence. United States v. Cantone, 426 F.2d 902, 905 (2d Cir.), cert. denied, 400 U.S. 827 (1970); Arnold v. United States, 336 F.2d 347, 352-353 (9th Cir. 1964), cert. denied, 380 U.S. 982 (1965).
 
 
 13
 A single agreement to accomplish an unlawful object does not cease to be a single conspiracy because there exists a time gap in the proof, or because there is a change in the composition of the membership. Braverman v. United States, 317 U.S. at 52; United States v. Hutul, 416 F.2d 607 (7th Cir. 1969), cert. denied, 396 U.S. 1007, 1012 (1970); United States v. Stromberg, 268 F.2d 256, 263-64 (2d Cir.), cert. denied, 361 U.S. 863 (1959). Thus, the government 'may establish the existence of a continuing core conspiracy which attracts different members at different times' and which involves more than one subsidiary scheme. United States v. Boyd, 595 F.2d at 123-24. When 'the separate means and methods [are] connected to each other not only by a common plan [to allocate projects and rig bids], but also by a substantial indentity of each of the defendants and coconspirators in agreeing to and carrying out the [conspiracy], the evidence [is] consistent only with the existence of one overall conspiracy as described in the indictment.' United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 196 (3d Cir. 1970), cert. denied, 401 U.S. 948 (1971). If the conspirators are dependent on each other for their success, this may constitute evidence of a single conspiracy. United States v. Warner, 690 F.2d 545, 550 (6th Cir. 1982).
 
 
 14
 A variance is not to be regarded as material where it is not of a character which could have misled the defendant at the trial, . . . or where it involved no element of surprise prejudicial to the efforts of the defendant to prepare his defense, . . . or where it does not involve sustantial rights.
 
 
 15
 United States v. Goble, 512 F.2d 458, 466 (6th Cir.), cert. denied, 423 U.S. 914 (1975), quoting United States v. Mills, 366 F.2d 512 (6th Cir. 1966); see also United States v. Warner, 690 F.2d at 548.
 
 
 16
 Applying these standards to the evidence in this case, we find that the jury verdict is supported by substantial evidence. Given a construction favorable to the government, the evidence established that representatives of several electrical contracting companies arranged predetermined bids on a series of projects from the summer of 1979 until approximately August of 1981. Essentially the same core group of individuals, appellant and two other contractors, were involved in rigging most of the bids. Each engaged in bidrigging because he recognized that if he agreed to rig a bid he might rely in the future on the cooperation of his coconspirators when he wanted pre-arranged bids in his favor. The evidence was sufficient to prove a single conspiracy.
 
 
 17
 Although there were several acts of bidrigging over an extended period of time, this factor does not preclude the existence of a single conspiracy. See, e.g., United States v. Lyons, 670 F.2d 77, 78 (7th Cir.), cert. denied, 457 U.S. 1136 (1982) (one continuous conspiracy to rig bids found even though there were many acts of bidrigging over a long period of time among various combinations). There was in that case, as here, a 'permanent mechanism for activating smaller groups interested in particular contracts . . .. The fact that the secondary or subsidiary conspiracies to rig bids on a particular contract would in and of themselves also amount to violations of the Sherman Act does not immunize participants in the general, comprehensive conspiracy.' Lyons, 670 F.2d at 79.
 
 
 18
 As a vice president of Yobe Electric, Ruggles successfully solicited collusive bids to allow Yobe to win one project, agreed to submit collusive bids to allow other conspirators to win other projects, advised one conspirator (at the request of another) to trade rigged projects on a quid pro quo basis, identified and contacted other bidders to arrange collusion on upcoming projects, and advised a coconspirator on the proper method of communicating collusive bids. We find this sufficient to support the jury's guilty verdict.
 
 
 19
 Appellant contends, however, that absent a quid pro quo flowing from each contractor who agreed to submit a rigged bid, there can be no finding of a conspiracy. He relies solely on testimony by one coconspirator that he assumed appellant helped him out 'merely on a friendship basis'[2] and that the coconspirator felt 'obligated' to no one. We are not persuaded by the argument 'that there can be no quid pro quo on a series of jobs if one of the parties to the alleged agreement was not interested in the job.' Even when the conspirators submitted complimentary bids without requesting a specific quid pro quo, they expected to receive like 'cooperation' in the future. The conspirators also believed that they would ultimately have to return bidrigging favors granted them. See, e.g., United States v. Beachner Construction Co., 729 F.2d 1278 (10th Cir. 1984); United States v. David E. Thompson, Inc., 621 F.2d 1147, 1148 (1st Cir. 1980). In Thompson, a quid pro quo could be inferred because 'the very fact that putative competitors collaborated in such a way with one another [permits an inference] that the essence of this practice, or conspiracy lay in its reciprocal nature.' 621 F.2d at 1149. Although Ruggles did not himself receive a direct substantial benefit from the bidrigging scheme, his participation inured to the benefit of his employer.
 
 
 20
 Any agreement between competitors, moreover, to submit collusive, noncompetitive bids is a per se violation of the Sherman Act. United States v. Portsmouth Paving Corp., 694 F.2d at 317; United States v. Kopper Co., 652 F.2d 290, 294 (2d Cir.), cert. denied, 454 U.S. 1083 (1981); United States v. Bensinger Co., 430 F.2d 584, 589 (8th Cir. 1970) (bid submitted as a 'courtesy' to preserve good relations held violative). This per se rule is intended to promote competition and thus secure the best work at the lowest possible cost. Collusive agreements to submit rigged bids deprive bidding authorities of the benefit of competition regardless of an alleged lack of direct interest in that particular project.
 
 
 21
 The conspirators' belief as to the nature or existence of a conspiracy did not preclude an intent to carry out at least a 'friendly' bidrigging agreement. For example, in United States v. Beachner Construction Co., 729 F.2d at 1282, the government's 'witness denied that an agreement for a single conspiracy existed.' The court found, nevertheless, a single conspiracy, noting a continuing course of conduct. Similarly, the government's evidence in this case established a regular, if not continuous, course of conduct intended to affect competitive bidding on electrical construction projects.
 
 
 22
 Appellant notes a fifteen month hiatus between two alleged rigged projects. Appellant argues that this break in time alone is sufficient to terminate the alleged 'single' conspiracy. The rule is, however, that a conspiracy, once proven to exist, may be presumed to continue until its termination is affirmatively established. See, e.g., United States v. Portsmouth Paving Corp., 694 F.2d 312 (4th Cir. 1982);[3] United States v. Basey, 613 F.2d 198 (9th Cir. 1979), cert. denied, 446 U.S. 919 (1980). See also United States v. Beachner Construction Co., 729 F.2d at 1282; United States v. Lyons, 670 F.2d 77 (7th Cir.), cert. denied, 457 U.S. 1136 (1982), for other instances of convictions in similar charges where there were gaps during the conspiracy period.
 
 
 23
 Ruggles is correct that if multiple conspiracies were found to exist a variance between the indictment charging a single conspiracy and proof of multiple conspiracies might exist. For that variance, if any, to constitute reversible error, however, it must have prejudiced appellant's substantial right to a fair trial. Kotteakos v. United States, 328 U.S. 750 (1946); United States v. Bibby, 752 F.2d 1116 (6th Cir. 1985); United States v. Warner, 690 F.2d 545 (6th Cir. 1982). We find no such showing to be made of multiple conspiracies nor of deprivation of a fair trial.
 
 
 24
 The claim is made of prejudice from a 'spillover' effect by which the quilt of some conspirators may be transferred to others. Appellant fails to demonstrate, however, the relevance of the claimed 'spillover' principle here, since there is evidence, if believed, to show that appellant was the key figure in the bidrigging arrangement.[4] Where all the evidence of separate conspiracies would be admissible against a particular defendant,[5] no prejudicial variance is presumed. See United States v. Bibby, 752 F.2d at 1123.
 
 
 25
 Appellant also attempts to bring himself within the 'hub and spoke' multiple conspiracy rationale of Kotteakos where the government was found to have proved a pattern "of separate spokes meeting at a common center," but was unable to show a 'rim of the wheel to enclose the spokes.' 328 U.S. at 755. While appellant was the common center of the arrangement here involved by telephoning, arranging meetings, passing on bids, and the like, he was also involved with a number of other coconspirators in several of the projects.
 
 
 26
 [H]ere the evidence disclosed the rim of the wheel by demonstrating the interrelationships between the persons and the events. We are confronted with a record which contains sufficient evidence to support the finding that the defendants were members of a sodality of fraud and knowingly participated together to achieve the common illegal goal . . .. Each defendant did his part in promoting the venture and providing a necessary link in the scheme.
 
 
 27
 United States v. Hutul, 416 F.2d 607, 619 (7th Cir. 1969), cert. denied, 396 U.S. 1007, 1012, 1024 (1970). We believe, while the question is not entirely free from doubt, that this case is within the rule of Blumenthal v. United States, 332 U.S. 539 (1947), and should be classified as a single conspiracy, rather than a Kottea os kind of separate conspiracy.
 
 
 28
 The government here alleged: 'The activities of the defendants and co-conspirators as charged herein were within the flow of, and substantially affected, interstate commerce.' In support of this charge, the government offered at trial evidence that the coconspirators had equipment shipped across Massachusetts state lines for use in Ohio projects where the alleged bidrigging had taken place. Both oral and documentary evidence was submitted, including invoices showing sale and shipment of the equipment. Approximately $83,000 worth of such equipment was involved.
 
 
 29
 Acts constituting Sherman Act violations must be 'in restraint of trade or commerce among the several states.' 15 U.S.C. Sec. 1. Congress' power to regulate such activity is said to extend as far as the congressional power under the commerce clause. McLain v. Real Estate Board of New Orleans, 444 U.S. 232, 241 (1980); Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 194-95 (1974); Tarleton v. Meharry Medical College, 717 F.2d 1523, 1529 (6th Cir. 1983); United States v. Cargo Service Stations, Inc., 657 F.2d 676, 679 (5th Cir. 1981), cert. denied, 455 U.S. 1017 (1982). While no 'talismatic' test exists for determining the adequacy of the interstate commerce nexus, it is sufficient to show that defendant's 'activity is itself in interstate commerce, or if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce.' McLain, 444 U.S. at 242; see Tarleton, 717 F.2d at 1529; Heille v. St. Paul, Minnesota, 512 F. Supp. 810 (D. Minn. 1981), aff'd, 671 F.2d 1134, 1136 (8th Cir. 1982); Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341, 343 (9th Cir. 1969).
 
 
 30
 While coconspirators' activities were essentially of a local character, Ruggles' or his coconspirators' activities in the conspiracy had a relationship to interstate commerce. Giving all reasonable inferences a light most favorable to the government, we are persuaded that the interstate commerce element is met. Glasser v. United States, 315 U.S. at 80. Proof of the interstate commerce element as to one conspirator brings the activities of the entire group within the ambit of the Sherman Act. See, e.g., United States v. Young Brothers, Inc., 728 F.2d 682, 689 n.7 (5th Cir.), cert. denied, 105 S. Ct. 246 (1984). Here there was evidence that one of the coconspirators, Mid-States Electric, shipped in approximately $61,000 worth of equipment from Massachusetts to Ohio for one of the alleged rigged bid projects. Some $22,000 of equipment was ordered, moreover, by W. I. Lewis Electric, another coconspirator, for another job, which was also shipped from Massachusetts to Ohio. That job was also allegedly part of the bidrigging conspiracy. See, e.g., United States v. Fischbach & Moore, Inc., 750 F.2d 1183, 1192 (3d Cir. 1984), cert. denied, 105 S. Ct. 1397 (1985) (finding a sufficient nexus between locally rigged jobs and interstate commerce by shipment of out-of-state electrical equipment to be used on locally rigged jobs); United States v. Young Brothers, 728 F.2d 682 (5th Cir.), cert. denied, 105 S. Ct. 246 (1984) (holding that the interstate commerce element was satisfied in part because a single, small gasoline station purchased tires, batteries, and accessories); United States v. Finis P. Ernest, Inc., 509 F.2d 1256 (7th Cir.), cert. denied, 423 U.S. 874, 893 (1975) (interstate commerce element sufficiently proven where $9,307 worth of out-of-state plumbing materials had been purchased for use on a rigged city sewer project).
 
 
 31
 Appellant attacks the sufficiency of the evidence because the price paid for the out-of-state equipment was not affected by the rigging of bids. In this type of situation, however, 'the material consideration . . . is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so.' American Tobacco Co. v. United States, 328 U.S. 781, 811 (1945). See also United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224-226 n.59 (1940); United States v. Finis P. Ernest, Inc., 509 F.2d at 1261. It is the potential for restraint in interstate commerce that is crucial, not the actual effect on the price of goods shipped in interstate commerce. Taking into account all of Ruggles' arguments, we find the evidence sufficient (although attenuated) to prove the interstate commerce element of the offense.
 
 
 32
 Appellant further contends that a failure to disclose alleged exculpatory grand jury testimony of Slattery, an employee of one of the alleged bidrigging coconspiratorial companies, requires a new trial. Despite a request for all Brady material, the government did not furnish appellant a copy of this testimony until the morning the government intended to call Slattery as its witness. Appellant, however, did not object to Slattery's testimony on the basis of a Brady violation until after closing arguments had been made and the jury had been charged and sent out for deliberations. We first consider whether the Slattery grand jury testimony was exculpatory within the Brady-Agurs rule. Upon consideration, we share the view of the district court that this grand jury testimony is not exculpatory. Accordingly, we find no merit in this contention.[6]
 
 
 33
 The final assignment of error raised by appellant involves admission of certain documents into evidence that had not been made available to appellant within the time limits set by the pretrial discovery order. Fed. R. Crim. P. 16(d) provides:
 
 
 34
 If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.
 
 
 35
 The trial court is given broad discretion as to what, if any, sanctions to impose on a party for failing to comply with discovery orders. In this case, appellant cannot complain of the trial court's action when he had previously refused a continuance to inspect documentary evidence of interstate commerce and did not seek a continuance when the documents in question were admitted. On similar facts, a defendant was held not entitled to the sanction of exclusion of a laboratory report where he had failed to request a continuance or recess to examine the report. Since the prejudice about which defendant complained might have been cured, we reject his claim of prejudicial error. See United States v. Kubiak, 704 F.2d 1545, 1552-53 (11th Cir.), cert. denied, 464 U.S. 852 (1983). Similarly, appellant's refusal to accept the trial court's prior offer of a recess to inspect similar documents precludes his claim of prejudice. The challenged documents, in any event, merely corroborated the testimony of the government's key witnesses concerning the interstate purchases of equipment and were merely cumulative. We likewise overrule this assignment of error.
 
 
 36
 Accordingly, we AFFIRM the conviction and judgment of the district court.
 
 
 
 *
 HONORABLE ROBERT E. DeMASCIO, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Also indicted with appellant were Boyd Liquidation Corp., a successor to an electrical contracting firm, and Richard J. Boyd, the company's president. Boyd and his company pled nolo contendre
 
 
 [2]
 The coconspirator also gave other reasons why they were involved. He also stated that appellant suggested bidrigging as an easy way to guarantee a year-end profit
 
 
 [3]
 In Portsmouth Paving, there was an approximately two and one-half year lull in 'ongoing efforts to keep competition . . . to a minimum,' but since the court believed a bidrigging mechanism still existed, a conviction was affirmed. 694 F.2d at 318
 
 
 [4]
 Appellant was actively involved in six of the seven incidents of bidrigging or attempted bidrigging. Evidence of the seventh unsuccessful project was also admissible against appellant because he later tried to help one of the parties to that bidrigging convince another to return the favor by rigging a later project. See United States v. Goble, 512 F.2d at 474
 
 
 [5]
 Even if the statute of limitations had run on certain projects, 'federal courts in antitrust cases have, for the purpose of showing intent, consistently admitted evidence of conduct prior to the time covered by the indictment.' United States v. Dunham Concrete Products, Inc., 475 F.2d 1241, 1250 (5th Cir.), cert. denied, 414 U.S. 832 (1973)
 
 
 [6]
 Assuming, arguendo, that the grand jury testimony met the Brady-Agurs standard, the government's disclosure of the testimony prior to the close of the case and jury deliberations gave appellant sufficient time and opportunity to make the testimony part of the record if he desired to do so. See United States v. Williams, 738 F.2d 172, 178-79 (7th Cir. 1984); United States v. Allain, 671 F.2d 248, 255 (7th Cir. 1982); United States v. Enright, 579 F.2d 980, 989-990 (6th Cir. 1978)