UNITED STATES of America,
Plaintiff-Appellee,

v.

Jeraline AYOTTE, Clinton Labadie, and
Douglas Logan, Defendants-Appellants.

Nos. 83–1035, 83–1036 and 83–1084.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1984.

Decided Aug. 24, 1984.

Rehearing Denied in No. 83–1035
Oct. 29, 1984.

Certiorari Denied Dec. 3, 1984.
See 105 S.Ct. 574.

John L. Belanger, Warren, Mich. (Court-appointed), for Clinton Labadie.

Gershwin A. Drain, Federal Defender Office, Kenneth R. Sasse (argued), Detroit, Mich., for Jeraline Ayotte.

Frederick M. Finn, Detroit, Mich., for Douglas Logan.

Leonard R. Gilman, U.S. Atty., Elizabeth A. Wild, Asst. U.S. Atty. (argued), Detroit, Mich., for U.S.

Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and GIBSON, District Judge.[*]

WELLFORD, Circuit Judge.

Clinton David Labadie, Douglas Frank Logan, and Jeraline S. Ayotte appeal their convictions for violations of federal drug laws. We AFFIRM the convictions of defendants Labadie and Logan, but we REVERSE the convictions of defendant Ayotte.

## I.

On August 24, 1982, a grand jury returned a six-count indictment charging a drug conspiracy involving five individuals: Labadie, Logan, Ayotte, and two other individuals, Gary Fondren and James LaBean. This appeal pertains to defendants Labadie, Logan, and Ayotte. Each of these defendants was charged in count one of the indictment, which alleged a conspiracy to possess with intent to distribute and to distribute lysergic acid diethylamide (LSD). De-

[*] The Honorable Benjamin F. Gibson, United States District Judge for the Western District of Michigan, sitting by designation.

fendant Ayotte was also charged in count two, alleging distribution of cyclohexamine (PCE), and in count three, charging aiding and abetting the distribution of LSD. Defendant Labadie was also charged in count four of the indictment with aiding and abetting distribution of LSD. Defendant Logan was also charged in count five of the indictment with aiding and abetting possession with intent to distribute LSD. The jury found defendants Ayotte and Labadie guilty as charged. Defendant Logan was found guilty of the aiding and abetting charge but was acquitted on the conspiracy charge.

## II.

■ Each defendant challenges the sufficiency of the evidence. In considering such a challenge, this court does not sit as a trier of fact and may not enter into a de novo consideration of the evidence. *United States v. Meyers*, 646 F.2d 1142, 1143–44 (6th Cir.1981); *United States v. Levinson*, 405 F.2d 971, 985 (6th Cir.1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1746, 23 L.Ed.2d 219 (1969). The jury's verdict "cannot be reversed if there is substantial evidence to support the findings of guilt." *Levinson*, 405 F.2d at 985. Moreover, "[i]n considering the sufficiency of the evidence, we do not determine whether it establishes guilt beyond a reasonable doubt, but only that the evidence would permit the trier of facts to find the defendants guilty beyond a reasonable doubt." *Id.; see also Meyers*, 646 F.2d at 1143–44; *Brewer v. Overberg*, 624 F.2d 51, 53 (6th Cir.1980), *cert. denied*, 449 U.S. 1085, 101 S.Ct. 873, 66 L.Ed.2d 810 (1981); *Goldman v. Anderson*, 625 F.2d 135, 137–38 (6th Cir.1980). If the evidence is such that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is one for the jury. *E.g., United States v. Gibson*, 675 F.2d 825, 829 (6th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982). The evidence must be construed in the manner most favorable to the prosecution. *Glassner v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Proof of some kind of formal agreement is not nec-

essary to establish a conspiracy; to the contrary, the existence of a conspiracy may be inferred from acts done with a common purpose. *United States v. Luxenberg*, 374 F.2d 241, 250 (6th Cir.1967); *see also United States v. Marino*, 658 F.2d 1120, 1124 (6th Cir.1981). A review of the evidence in this case construed most favorably to the prosecution demonstrates its sufficiency to support the convictions.

■ Defendants were charged as the result of an undercover investigation by the Federal Drug Enforcement Agency (DEA) into wholesale trafficking of LSD and PCE in the Pontiac, Michigan, area. The investigation spanned several months, beginning in March 1982 when an informant took DEA Agent Roger Kehrier to an apartment above a beauty shop in Pontiac to purchase 1,000 tablets of PCE and 3,000 tablets of LSD. After Kehrier was introduced to defendant Ayotte, Ayotte asked him if he had the money to make the drug buys. Kehrier displayed $4,000 and asked Ayotte how much the 1,000 "hits" of PCE would cost. She quoted a price, and as Kehrier gave her the money, Fondren appeared from a rear bedroom, introduced himself and asked if everything was "cool." Ayotte and Fondren left the apartment together; 30 minutes later, they returned, and Ayotte gave Kehrier 1,000 PCE tablets.

When Kehrier expressed interest in also purchasing 3,000 tablets of LSD, Fondren called his source and then explained to Kehrier that they would have to drive to the location of his source to obtain the drugs. Fondren drove Ayotte's car while Ayotte rode with Kehrier in Kehrier's vehicle. En route, Ayotte mentioned to Kehrier that the transaction would occur in a park on the river and that the source of the drugs was Fondren's. Before arriving at the intended destination, Fondren's erratic driving prompted Ayotte to change cars and to drive her own. Both cars stopped at a gas station, and Kehrier gave Fondren his telephone number, stating that he wanted to negotiate for larger amounts of LSD directly with Fondren in the future. Fon-

dren asked Kehrier to contact him in a week if Kehrier was pleased with the LSD to be supplied on this trip. They proceeded to the residence of LaBean, which was on Quarry Road near a large park. Fondren said he would take Kehrier's payment for the LSD into the source's house and return with the LSD, but Kehrier refused to pay without first seeing the LSD. Ayotte joined in the discussion between Fondren and Kehrier regarding payment. Fondren went into the house to confer with his source. While waiting outside, Kehrier mentioned to Ayotte that he had given his telephone number to Fondren. She became angry and demanded that Kehrier get his phone number back from Fondren and give it to her. Fondren returned from LaBean's house and sold 3,000 LSD tablets to Kehrier. After refusing to give Ayotte the telephone number he had given to Fondren, Kehrier watched them return to Ayotte's car. Fondren and Ayotte were exchanging money as Kehrier drove off. Defendant Labadie's car was observed at LaBean's residence during the drug purchase.

Later, Kehrier telephoned Ayotte to complain about the quality of the PCE. At the same time, he told her that he was interested in obtaining more LSD, and Ayotte quoted him prices for large quantities of both PCE and LSD. Arrangements were discussed for purchase, but on April 12, 1982, Ayotte called Kehrier and expressed suspicion that he was a police officer. Kehrier did not speak to Ayotte again.

The next week, however, Kehrier arranged for DEA Agent Patrick Valentine to go to the beauty shop to buy LSD from Fondren. Valentine and Fondren drove to a convenience store on Quarry Road. When Valentine refused to pay in advance for the LSD, Fondren said he would talk to his source and would be back in 20 minutes. Fondren walked away down Quarry Road. When Fondren returned, he said that his "man" wanted the money in advance, but Valentine again refused. After further discussion, Fondren and Valentine proceeded to LaBean's residence; LaBean emerged to discuss the LSD purchase with Valentine. At that time, LaBean admitted

that he was Fondren's contact. LaBean agreed to take Valentine to his source. The participants went to a store where LaBean made a telephone call. He advised Valentine that he couldn't reach his source but would seek another. The transaction, however, was not concluded.

Agent Kehrier called Ayotte's telephone number the next day, but Fondren answered the call and related the previous day's events. Asked if he was still interested in obtaining drugs, Kehrier indicated that he did not wish to deal directly with Fondren and that he had used Valentine as a contact. Fondren told Kehrier that Ayotte was no longer available but that Fondren would do business in her stead.

Within a few weeks, Agent Valentine went to LaBean's residence and asked to buy LSD. Although expressing concern about whether Valentine was a police officer, LaBean nevertheless called a source, "Butch," to ask for the LSD. LaBean arranged a meeting with the source at an A & W Root Beer stand a short time later. Upon arriving there later, LaBean pointed out defendant Labadie's car and said his source was already there. Valentine gave LaBean $710 for the agreed quantity of LSD, and LaBean proceeded to Labadie's car. After several minutes, LaBean returned and delivered the LSD tablets to Valentine.

On a later occasion Valentine arranged with LaBean for another LSD buy. After Valentine arrived at LaBean's house, LaBean made some calls and told Valentine his source was obtaining the LSD. After a man named "Frank" called, LaBean advised that he wanted 1,000 tablets; they agreed to meet at "Bob's." Valentine and LaBean then went to the same A & W stand, and Valentine advanced the agreed price. LaBean drove to the home of Margaret Yale, where defendant Frank Logan had rented a room. LaBean entered the house and then returned to the A & W stand to deliver 1,000 LSD tablets to Valentine.

Subsequently, Agent Valentine contacted LaBean at his residence and asked to purchase 10,000 tablets of LSD. On this occasion, LaBean instructed Valentine to follow him to a gas station near Logan's room. When they arrived, LaBean pointed to the house where Logan was residing, walked to it, and entered. A short time later he returned to the gas station with about 10,-000 tablets of LSD. LaBean was then arrested. Agent Kehrier, who had been surveilling Logan's residence, proceeded to the house, announced himself several times, and entered. He saw Logan exit a rear bedroom. Kehrier again identified himself as a police officer, and Logan padlocked the door of his room before finally being arrested.

A list of names and telephone numbers was found in Logan's wallet including LaBean's telephone number and defendant Labadie's number next to the name "Butch." That same day, defendant Labadie's phone was disconnected. Defendant Labadie's phone book also listed the telephone number for Logan's residence next to the name "Frank." Ballistics tests showed that the LSD tablets obtained on three of the four occasions by the agents were manufactured in the same press.[1]

The evidence recited sufficed to support the convictions of Labadie and Logan. Defendant Ayotte argued that she could not be convicted of conspiring to distribute LSD because the evidence did not establish anything but her "mere presence" at an LSD transaction. *See United States v. Baker*, 499 F.2d 845, 847–49 (7th Cir.), *cert. denied*, 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974). Even assuming the soundness of *Baker*, however, the evidence could support the conclusion that Ayotte played a more active role in the conspiracy. The evidence was clearly sufficient to support the conclusion that Labadie participated in the conspiracy and that each defendant was guilty as charged in the aiding and abetting counts.

**III.**

■ Labadie raises two other issues on appeal. First, he argues that the trial court erred in permitting Agent Kehrier to testify that LaBean had identified Labadie as LaBean's LSD supplier. This hearsay was properly admitted, however, pursuant to the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). The evidence supported the district court's preliminary finding that the conspiracy to distribute LSD existed and that LaBean and Labadie were participants. *See United States v. Vinson*, 606 F.2d 149, 152–53 (6th Cir.1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 319 (1980); *United States v. Enright*, 579 F.2d 980, 986 (6th Cir.1978). Nor did the court err in rejecting Labadie's argument that the prejudicial effect of the hearsay required severance of the conspiracy count from the substantive count against him. Labadie's argument ignores the policy behind the co-conspirator exception. Evidence may be admissible under the exception even when no conspiracy is charged in the indictment, especially where there is a charge of aiding and abetting. *See, e.g., United States v. Kendricks*, 623 F.2d 1165, 1168 n. 5 (6th Cir. 1980). Accordingly, no impermissible prejudice resulted from denial of the motion.

■ Second, Labadie argues that the admission of certain statements violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). On August 31, 1982, Agent Kehrier was notified by his office to contact "Clint" at a given telephone number. Kehrier called the number, and Labadie answered. Only then did Kehrier realize who "Clint" was. Labadie asked Kehrier whether Kehrier was "certain the stuff was LSD." When Kehrier did not respond, Labadie stated, "My friends told me it was mesc. Had I known it was acid, rather than mescaline, I would have never sold it." He then told Kehrier that he knew some "big names" in

---

1. The use of ballistics analysis on pills is analogous to ballistics tests done on bullets. Just as a specific gun barrel can be identified by the markings left on a bullet, a specific punch press can be identified by the tool marking left on a tablet with a sufficiently hard surface.

Florida and Michigan and that, compared to them, he was "a minnow in the sea." The district judge ruled that evidence of the conversation could not be admitted in the government's case-in-chief. However, after defendant testified that he had never sold mescaline or drugs of any kind, the government was allowed, over defense counsel's objection, to introduce on rebuttal testimony by Agent Kehrier about the conversation. On appeal, Labadie contends that Kehrier's testimony about the conversation should not have been allowed because Kehrier did not advise Labadie of his rights under *Miranda*. The claim is meritless. The record reveals that defendant was neither in custody, *see United States v. Blum*, 614 F.2d 537 (6th Cir.1980), nor being interrogated, *see Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), at the time of the statements.

### IV.

■ Logan argues that the admission of statements against him pursuant to the co-conspirator exception to the hearsay rule requires reversal of his conviction for substantive offenses because of his acquittal on the conspiracy charge. He also alleges error in the district court's jury charge regarding the hearsay. Neither argument has merit.

Relying on *United States v. Lucido*, 486 F.2d 868 (6th Cir.1973), Logan argues that the admission of hearsay regarding LaBean's identification of Logan's residence as the location of LaBean's source requires reversal of Logan's conviction on a substantive charge given his acquittal on the conspiracy charge. In *United States v. Robinson*, 651 F.2d 1188, 1196 (6th Cir. 1981), this court explained the scope of *Lucido*. This court held that acquittal on a conspiracy count will preclude consideration of co-conspirator hearsay on remaining substantive counts only when evidence other than the co-conspirator hearsay is inade-

quate to create a prima facie case of criminal joint venture. The government argues that the *Robinson* court failed to consider the effect of the post-*Lucido* enactment of the Federal Rules of Evidence in enunciating the appropriate test; it suggests that the nonhearsay must demonstrate the existence of the criminal joint venture by a preponderance of the evidence in the *Lucido-Robinson* situation to permit consideration of the hearsay on the substantive count. Because the nonhearsay in this case suffices under either test, the conviction may stand.

■ Logan also alleges error in the court's instruction relating to the jury's consideration of the co-conspirator hearsay. The district court instructed the jury that it was not to consider co-conspirator hearsay as to a defendant before concluding beyond a reasonable doubt both that a conspiracy existed and that the defendant was a part of the conspiracy. While the instruction was erroneous, it was *more favorable* to defendant than was warranted. *See Enright*, 579 F.2d at 986–87; *United States v. Mitchell*, 556 F.2d 371, 377 (6th Cir.), *cert. denied*, 434 U.S. 925, 98 S.Ct. 406, 54 L.Ed.2d 284 (1977). The error therefore certainly caused no prejudice to Logan and is no basis for reversal.

### V.

The principal contention of defendant Ayotte is that the district court erred in restricting her counsel's cross-examination of Agent Kehrier.[2] Kehrier testified at trial concerning Ayotte's involvement with Fondren in the LSD transaction on March 30, 1982. The district court did not allow counsel to question the agent on his omission of certain matters from his grand jury testimony or from his written report. Ayotte contends that the district court committed reversible error in disallowing her attor-

---

**2.** Ayotte also contends but does not persuade us that the court erred in instructing the jury on

her defense theory.

ney's cross-examination of Kehrier regarding his failure to mention in his report and in his grand jury testimony that he saw Ayotte receiving money from Fondren and that Ayotte became upset when it appeared that Kehrier intended to deal directly with Fondren in the future.[3]

Latitude is normally permitted in cross-examining prosecution witnesses, and limitation of such cross-examination may only be based on sound reasons justifying a departure from this norm. *McConnell v. United States*, 393 F.2d 404, 406 (5th Cir.1968); *United States v. Baker*, 494 F.2d 1262, 1266–67 (6th Cir.1974). In *Baker*, this court evaluated a restriction on cross-examination by examining whether the jury had "sufficient other information upon which it may make a discriminating appraisal" of the prosecution witness' testimony. *Id.* at 1267. In this case, no other witness corroborated the testimony in question, which we consider to be critical to Ayotte's convictions. *See United States v. Garrett*, 542 F.2d 23, 26–27 (6th Cir.1976) (distinguishing between matters of general credibility and questions that might establish untruthfulness regarding specific events of the crime charged). We therefore conclude that the restriction on cross-examination was erroneous. We cannot conclude beyond a reasonable doubt that the error was harmless. *See Mayes v. Sowders*, 621 F.2d 850, 856–58 (6th Cir.), *cert. denied*, 449 U.S. 922, 101 S.Ct. 324, 66 L.Ed.2d 151 (1980). Ayotte's convictions must therefore be reversed, and the matter is remanded for a new trial of Ayotte.

## VI.

Accordingly, we AFFIRM the convictions of defendants LaBadie and Logan, and we REVERSE the convictions of defendant Ayotte.

---

**3.** In *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980), the Supreme Court noted, "Common law·traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. 3A J. Wigmore, Evidence § 1042, p. 1056 (Chadbourn rev.1970)." *See also McCormick's Handbook of the Law of Evidence* § 34, at·68 (E. Cleary 2d ed. 1972).