831 F.2d 1064
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jerry SCHWARTZ, Defendant-Appellant.
 No. 86-6181.
 United States Court of Appeals, Sixth Circuit.
 Oct. 29, 1987.
 
 Before BOYCE F. MARTIN, Jr., and DAVID A. NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Appellant, Jerry Schwartz, appeals his jury conviction of conspiracy to defraud the United States in violation of 18 U.S.C. Sec. 371, and of aiding and assisting in the preparation and presentation of a false statement to the Internal Revenue Service in violation of 26 U.S.C. Sec. 7206(2). A timely notice of appeal was filed. Schwartz asserts in this appeal that he was denied his Fifth Amendment right to due process of law because of the trial court's rulings, and that the verdict is not supported by the evidence. For the following reasons, we affirm the conviction.
 
 I.
 
 2
 This case involves Schwartz's preparation of a personal income tax return on which personal income was fraudulently treated as long term capital gain. Schwartz, a licensed attorney and certified public accountant, was contacted by Louis Lucas to assist Patricia Vaughan (Vaughan)[1] with a tax matter. Lucas, a former Assistant United States Attorney, was employed as legal counsel for William Tanner and the William B. Tanner Company. He had set up a personal service corporation, Research Associates, Inc. (Research Associates), for Vaughan who was receiving payments from William Tanner for media advice. The corporation was one of eight to ten such corporations Lucas set up for parties doing business with or for Tanner.[2] During the next three years, money received from Tanner was deposited in the account of Research Associates. Vaughan would then withdraw the money for her own use. The money withdrawn was treated as a loan on the corporate tax returns, which Schwartz prepared.
 
 
 3
 By 1979, the loan amount had increased to $62,568.26. This amount was treated as a long term capital gain on Vaughan's 1979 personal income tax return. The return based this treatment on the sale of one thousand shares of Research Associates for $62,568.26. The filing of this return and its treatment of the discharge of the loan as a capital gain formed the basis of the charges against Schwartz.
 
 
 4
 On April 15, 1980, Vaughan, Lucas and Schwartz met to discuss Vaughan's tax situation. At this meeting, the decision to treat the loan as a long term capital gain was made.
 
 
 5
 Schwartz contended that he treated the loan as long term capital gain because he had been told that the corporation had been sold. He testified that Lucas told him it had been sold in December 1979 to an advertising agency.
 
 
 6
 Lucas testified that Schwartz came up with the sale idea on April 15, 1980 while discussing methods of handling the loan amount for tax purposes.
 
 
 7
 One of the alternatives Mr. Schwartz pointed out, the typical way she can reduce those taxes, he said, for example, "Suppose we say that the corporation had been sold to you, Louis, at the close of business in December of the previous year, then we could treat the amount of money that is on the books of the company as a loan. We could treat that as a sales price, and at that point it would be taxed at the capital gains rate rather than ordinary income rate."
 
 
 8
 Direct Testimony of Louis Lucas.
 
 
 9
 Vaughan's testimony on the matter is as follows:
 
 
 10
 At that meeting that day they were talking about how to dissolve the company, and I don't know a lot of things they were saying, but they said if the company were sold, then I wouldn't file a corporate tax anymore. I would have to file this money on my personal tax return, so from hearing that conversation, I assumed that however it was done, that I had sold the company to Louis Lucas, because he had a dollar in his hand, and I don't know if he ever gave it to me or not, but that is what I thought happened.
 
 
 11
 Direct Testimony of Patricia Vaughan.
 
 
 12
 On March 24, 1986, Schwartz was indicted for his preparation of the return on behalf of Vaughan. On April 23, 1986, defense counsel filed a motion for discovery of exculpatory information. In response to this request, the government supplied a copy of a plea agreement between Lucas and the government on May 7, 1986. In the agreement, Lucas agreed to plead guilty to a two count indictment charging violations of 18 U.S.C. Sec. 371 and the Government agreed to dispose of all possible criminal charges that might otherwise have been brought by the Government against Lucas as a result of his dealings on behalf of William B. Tanner or William B. Tanner Company, and all possible criminal tax charges which might otherwise have been brought against him as a result of transactions which may have occurred prior to the date of the agreement. In a cover letter accompanying the plea agreement turned over to Schwartz, the Government stated that it had no exculpatory evidence. On May 18, 1986, the defendant filed a second motion for production of exculpatory information and a motion for disclosure of impeaching information. The latter motion included a request for any and all records showing prior misconduct or bad acts committed by the witness.
 
 
 13
 A hearing was held on these motions. At the hearing the defense counsel reiterated their request for information regarding specific illegal acts committed by Lucas that are not referenced in the plea agreements. The Government again denied having any exculpatory information, claiming that since Lucas never admitted to any other crime there was no more information to produce. The court denied the motions, but offered the defendant the opportunity to question Lucas on the illegal matters outside the presence of the jury. At trial, the court limited the cross examination to a general discussion of these other acts committed by Lucas.
 
 II.
 
 14
 In his initial argument, Schwartz claims that the Government's failure to provide him with information concerning other crimes or illegal acts committed by Lucas, when such information was specifically requested, denied him his Fifth Amendment right to due process and warrants a reversal of his conviction. He bases this argument on the line of cases that began with Brady v. Maryland, 373 U.S. 83 (1963).
 
 
 15
 It is well settled that a criminal defendant is entitled to exculpatory information, Brady, 373 U.S. at 87, including impeachment information. See Giglio v. United States, 405 U.S. 150, 154 (1972). However, "a prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused, that if suppressed would deprive the defendant of a fair trial...." United States v. Bagley, 473 U.S. 667, 675 (1985) (footnote omitted). See also United States v. Agurs, 427 U.S. 97, 106 (1976).
 
 
 16
 A defendant seeking to show a breach of the Brady doctrine warranting reversal of his conviction must establish that the prosecution suppressed evidence that was favorable to the accused and material to the question of guilt or punishment. See Brogdon v. Blackburn, 790 F.2d 1164, 1167, reh'g denied, 793 F.2d 1287 (5th Cir.1986) (en banc), cert. denied, 107 S.Ct. 1985, reh'g denied, 107 S.Ct. 3245 (1987); United States v. Kopituk, 690 F.2d 1289 (11th Cir.1982), cert. denied, 463 U.S. 1209 (1983) (citing Moore v. Illinois, 408 U.S. 786, 794-95 (1972)).
 
 
 17
 In this case, Schwartz claims that the prosecution suppressed exculpatory evidence. The government denies having such evidence. Schwartz bases his claim on the allegation that the events surrounding Lucas and Tanner were well known in the community. He also infers from the plea agreement and a statement made by the prosecutor at a hearing on this matter that the government had impeachment information.[3] Schwartz's evidence has not established that the prosecution suppressed material exculpatory evidence. Accordingly, we reject Schwartz's Brady claim.
 
 
 18
 Schwartz argues next that he was denied due process of law because the cross examination of Lucas was limited. At trial the defendant's theory was that he was the "patsy" for Lucas who was involved in setting up several sham corporations to receive kickbacks for providing services to Tanner. He contended that he was merely an innocent participant in one of these transactions and that he relied on information supplied by Lucas. Schwartz wanted to prove his theory and show Lucas' bias by delving into the specifics of Lucas' involvement in other corporations and the Tanner fraud and kickback scheme. The court limited the cross-examination to a general investigation of these matters.
 
 
 19
 "[L]imitations of cross-examination must be examined within the circumstances of each case and the trial court's determination in this regard should not be disturbed except where an abuse of discretion is shown." United States v. Baker, 494 F.2d 1262, 1266 (6th Cir.1974). See also United States v. Padin, 787 F.2d 1071, 1076 (6th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 93 (1986). In United States v. Ayotte, 741 F.2d 865, 871 (6th Cir.), cert. denied, 469 U.S. 1076 (1984), this court examined "whether the jury had sufficient other information upon which it may make a discriminating appraisal of the prosecution's witnesses' testimony," Ayotte, 741 F.2d at 871, in determining whether there is an abuse of discretion. The court, after noting that no other witness corroborated the inculpating testimony, found that the limit on cross-examination was an abuse of discretion.
 
 
 20
 In the instant case the testimony of Lucas was substantially corroborated by the Vaughan testimony. Also, the defense was able to elicit from Lucas evidence from which which it could argue its theory of the case and his bias. Lucas testified about his knowledge of the kickback scheme, the fact that he was being sued for fifteen million dollars as a result of the scheme and the fact that he set up ten similar personal service corporations. Given the circumstances of this case, we conclude that the limitation of Lucas' cross-examination was not an abuse of discretion.
 
 
 21
 Schwartz's third argument is that he was denied due process by the misconduct of the prosecutor. The first area of alleged misconduct is the prosecutor's knowing use of false testimony. This allegation is based on the premise that the statement in the plea agreement along with other information which was commonly known prove that Lucas committed other crimes. From this premise, Schwartz contends that the prosecutor used false evidence when he remained silent when Lucas testified that there were no other possible charges and that the government had not discussed any other crimes. The prosecutor, however, steadfastly contends that he has no proof of other crimes.
 
 
 22
 In support of this portion of his argument, Schwartz relies on Napue v. Illinois, 360 U.S. 264 (1959). Napue stands for the general proposition that the state cannot knowingly use false evidence, including false testimony that goes only to credibility. Id. at 269-70. In Napue a government witness falsely testified that he had not received or been promised any consideration. Later, the assistant attorney general admitted making such a promise. In the case before us, Schwartz presents allegations and inferences that the prosecution knowingly used false testimony. We are not persuaded by the evidence Schwartz presents. Accordingly, we cannot find that the prosecution knowingly used false testimony in this case.
 
 
 23
 The remainder of this argument concerns the conduct of the prosecutor during his cross examination of the defendant and his expert witness, and his comments made during closing argument.
 
 
 24
 In determining whether the alleged misconduct of a prosecutor merits the reversal of a conviction, we consider the following factors: the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they were isolated or extensive, whether they were deliberately or accidentally placed before the jury; and the strength of the competent proofs introduced to establish the guilt of the accused. United States v. Leon, 534 F.2d 667, 679 (6th Cir.1976).
 
 
 25
 Not every instance of misconduct requires the reversal of a conviction, however, and when isolated remarks are made in the course of a long trial and the jury is given an appropriate cautionary instruction designed to overcome or to dissipate any prejudice that may have been caused, the error may be harmless.
 
 
 26
 Id. at 479.
 
 
 27
 The first comment that Schwartz complains of is contained in the following exchange from his cross-examination:
 
 
 28
 Q. Did you know about it in 1980? Did you know she had filed a joint return in 1980 when you prepared her 1980 return--1979 return?
 
 
 29
 A. It is possible that I knew it then.
 
 
 30
 Q. Did you or didn't you know it?
 
 
 31
 A. I don't remember exactly. I knew I asked her to bring in her returns.
 
 
 32
 Q. Well you knew it, didn't you? Come on, be honest with us.
 
 
 33
 Immediately after defendant's objection, the prosecutor withdrew the question and apologized. The judge then made the following statement: "Mr. Clancy, it doesn't help too much when you take back remarks like that. You know it isn't proper to make all the side remarks, and you need to stop it." The other comments complained of were the prosecutor's "editorializing" and his arguing with the defendant's expert witness. As to many of these latter comments, the prosecutor was again rebuked by the trial judge.
 
 
 34
 While we do not condone the prosecutor's conduct, given the nature of the proof in this case and the fact that the prosecutor was rebuked by the trial court, we conclude that these comments made by the prosecutor do not warrant a reversal.
 
 
 35
 The last portion of this argument and, according to the appellant the worst of the alleged misconduct of the prosecutor, concerns his comments made during closing argument about Schwartz's motives for doing the work for Vaughan and Lucas. The prosecutor argued that Schwartz was motivated by the desire to acquire a millionaire tycoon as a client.
 
 
 36
 He is not interested in a Mercedes Benz or a house in Germantown. He doesn't want that. He is just doing it for free. He doesn't expect anything. Is that common experience? H & R Block doesn't charge you when he does your return, does he? He does it for free.
 
 
 37
 We all know that is how things work. Well, you all know that is not how things work, and that is exactly what Mr. Schwartz did. He did it to promote himself. Mr. Lucas already had a millionaire tycoon as a client, and Mr. Schwartz would like to have one you can make a lot of money like this.
 
 
 38
 Schwartz claims that these comments were outside the evidence. He contends that the evidence showed that "his assistance to Lucas covered a period of years, a period long enough to give Schwartz plenty of time to nurture any professional opportunities, there was no evidence that Schwartz attempted to or did further his professional interest." He points to the fact that he received $450.00 for seven hours work on Vaughan's corporate returns, her divorce and her personal return, which is not the sort of fee that leads to a Mercedes Benz and a big house in Germantown. He also states that the "prosecutor ... made the allegation in the indictment that Schwartz had committed criminal acts for profit and to further business and professional interests. The trial evidence, however, was that Schwartz did not profit financially or otherwise."
 
 
 39
 It is well established that a prosecutor has the right to urge upon the jury all reasonable inferences and deductions from the evidence. See United States v. Bess, 593 F.2d 749, 756 (6th Cir.1979) (quoting Henderson v. United States, 218 F.2d 14 (6th Cir.), cert. denied, 349 U.S. 920, reh'g denied, 349 U.S. 969 (1955)). See also 3 C. Wright, Federal Practice and Procedure Sec. 555 at 277 (2d ed. 1982). The government points out that Particia Vaughan was a stranger to Schwartz. She was the girlfriend of a multimillionaire. Her work was referred to him by the attorney for the millionaire. Schwartz prepared her returns for no compensation. They argue that no one does something for nothing year after year for a perfect stranger who happens to be the girlfriend of a millionaire. They conclude that Schwartz's ultimate motive was financial gain.
 
 
 40
 We conclude that the inferences drawn by the prosecutor were reasonably drawn from the evidence. Therefore, his statements made during closing argument do not warrant a reversal of the conviction.
 
 
 41
 In light of the competent proof introduced to establish the guilt of the appellant, and the nature of the prosecutor's comments and the circumstances in which they were made, we conclude that the conduct of the prosecutor did not deny the appellant a fair trial.
 
 
 42
 Schwartz's final argument is that there is insufficient evidence to support the jury's conclusion that the return was false or that he knew they were false.
 
 
 43
 In order to prove specific intent, it must be shown that the defendant's conduct was willful. The Government must demonstrate that the defendant's conduct was a voluntary and intentional violation of a known legal duty. United States v. Pomponio, 429 U.S. 10, 12 (1976) (per curiam). "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 44
 The evidence showed that Schwartz knew the corporation was worthless and that he had characterized the withdrawn income as loans on the corporate return. His own testimony indicated that he accepted without question the statement that the stock had been sold for the exact amount of the loan. Although Schwartz testified that he was told that the corporation was sold in 1979, Lucas testified that the corporation had not been sold prior to the April 15th, 1980 meeting, and that Schwartz had devised the sale plan as a method for lowering Vaughan's income tax. Vaughan also testified that the decision to sell the corporation was made for tax purposes at the April 15th meeting.
 
 
 45
 Viewing all of this evidence in the light most favorable to the government, we conclude that there was substantial evidence to support the jury's conclusion that the return was false and that Schwartz knew it was false.
 
 
 46
 Accordingly, defendant's conviction is AFFIRMED.
 
 
 
 [1]
 Patricia Vaughan married William Tanner during the course of these events and subsequently changed her surname to Tanner. For purpose of clarity, she will be referred to as Vaughan
 
 
 [2]
 Lucas subsequently pled guilty to two counts of violating 18 U.S.C. Sec. 371 (conspiracy to commit offense or defraud the United States). The charges covered the forming of one of these corporations, and the Vaughan transactions for which Schwartz was being prosecuted
 
 
 [3]
 The prosecutor made the following statement at the pre-trial hearing:
 The things he did could have been made appear he committed a crime. [sic] There is no proof he committed any crime. It is some kind of allegations, some appearances of things, and if we get off into that with Louis Lucas, he worked for Mr. Tanner ten years. God knows where we would be.