UNITED STATES of America,
Plaintiff–Appellee,

v.

Tamara MILLIGAN (92–6654); Benny
Milligan (92–6655); James McElveen
(92–6666), Defendants–Appellants.

Nos. 92–6654—92–6666.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 27, 1993.

Decided Feb. 24, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied March 31, 1994 in
No. 92–6666.

William Cohen, Asst. U.S. Atty. (argued and briefed), Ernest W. Williams, Office of the U.S. Atty., Nashville, TN, for U.S.

William J. Marett, Jr. (argued and briefed), Bryan & Marett, Nashville, TN, for Tamara Milligan.

R.N. Bo Taylor (argued and briefed), Waynick & Cate, Nashville, TN, for Benny Milligan.

Sumter L. Camp, Asst. Federal Public Defender (argued and briefed), Federal Public Defender's Office, Nashville, TN, for James McElveen.

Before: KEITH, NELSON, and RYAN, Circuit Judges.

KEITH, Circuit Judge.

Defendants–Appellants Tamara Milligan, Benny Milligan and James McElveen appeal their jury convictions and sentences. All three were charged with four counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2; one count of wire fraud, in violation of 18 U.S.C. § 1343; and one count of conspiracy, in violation of 18 U.S.C. § 371. For the reasons stated below, we **AFFIRM.**

## I.

In July 1990, Benny Milligan ("Milligan") performed janitorial work at the Martin–Marietta plant in New Orleans, Louisiana, which manufactured external fuel tanks for the National Aeronautic and Space Administration's ("NASA") space shuttle. He received health insurance subsidized by NASA, with Connecticut General Insurance Company as the provider. In return for a minimal deductible and premium, the health insurance plan provided complete coverage to Milligan and his family. James McElveen ("McElveen") a commercial painter, had no health insurance.

On Sunday, July 8, 1990, Milligan, his wife Tamara, McElveen and Robert Johnson were visiting their friends, Justin and Tabitha McCalib, in Hohenwald, Tennessee. The six friends travelled to a waterfall on the Natchez Trace. As the group approached the waterfall, McElveen accidentally ran off an embankment obscured by overgrown bushes and trees and fell thirty feet. Because he was unconscious and bleeding profusely, McElveen's friends carried him up the hill, and drove him to the hospital. McElveen, whose palor was grey and lips blue, cried and moaned, but did not speak.

Upon arrival at Lewis Community Hospital ("LCH"), Milligan ran into the hospital and stated he needed assistance for an accident victim. He identified the victim as "Benny Milligan." Upon returning to the car with hospital personnel, Milligan secretly told his wife he identified McElveen as "Benny Milligan." There is evidence McElveen's friends questioned whether he would receive medical care if he was uninsured. Tabitha

McCaleb stated she had seen news reports of hospitals evicting uninsured patients.

Mrs. Milligan signed both an insurance claim and a treatment consent form as McElveen's wife. Benny Milligan provided Registered Nurse Tara Barber ("Nurse Barber") with "Benny Milligan's" place of employment, insurance company, and health insurance number, but failed to provide her with an insurance card. Milligan and Tamara Milligan and Dr. John Middleton addressed McElveen as "Benny," to which McElveen responded. Dr. Middleton and Nurse Barber assumed they were treating Benny Milligan and were never told otherwise.

Dr. Middleton and Nurse Barber examined McElveen, who was covered with mud and blood on his left side. They placed him on a spine board to immobilize his back and Dr. Middleton stitched a laceration on McElveen's head. X-rays showed a fracture of McElveen's second lumbar vertebra (L–2), and possible fractures of the fourth or fifth thoracic vertebra, and the 12th thoracic vertebra. Because LCH could not treat McElveen's severe back injuries, Dr. Middleton arranged to transfer McElveen to Maury Regional Hospital ("MRH"), located in Columbia, Tennessee.

McElveen was originally admitted through MRH's emergency room, and Tamara Milligan later admitted him through the Admissions office. During an examination, Dr. Kenneth Moore addressed McElveen as "Mr. Milligan," and McElveen responded. Throughout his stay at MRH, McElveen responded to the names "Mr. Milligan" and "Benny." MRH policy admits all patients regardless of insurance status except those desiring elective surgery.

CAT scans taken at MRH revealed an unstable burst fracture threatening the spinal canal and increasing the risk of paralysis. A pulverized vertebra had pushed broken bone against a sac holding spinal fluid. This "burst" fracture of the L–2 vertebra also exploded bone fragments into the surrounding tissue and pinched the spinal canal.

Believing McElveen required spinal surgery outside his expertise, Dr. Moore referred McElveen to Vanderbilt University

Medical Center ("VUMC"). Two days later, McElveen was transferred to Vanderbilt.

At VUMC Dr. Dennis Devito ("Devito") examined McElveen. Dr. Devito also addressed McElveen as "Mr. Milligan," and McElveen responded. Dr. Devito discussed treatment options, his recommendations, and the risks of surgery with McElveen. After the discussion, McElveen signed treatment and operative consent forms as "Benny Milligan." VUMC provides uninsured patients the same care it does insured, and, when necessary, will arrange alternative bill payment procedures.

McElveen's surgical procedure involved two surgeons, several assistants, and lasted about six hours. Neurosurgeon Dr. Bennett Blumenkpf removed bone fragments and reconstructed McElveen's spinal cord. Dr. Devito, transplanting bone from McElveen's hip to his lumbar spine, grafted a bony bridge from the L–3 to the L–1 vertebra.

McElveen was hospitalized at VUMC from July 10 to July 20, 1990. During this time, Benny Milligan returned to work at the Martin Marietta plant in Louisiana.

On September 4, 1990, Benny Milligan completed a CIGNA insurance form concerning the medical services provided to McElveen. Milligan reported he fell down a hill, and no other parties were responsible or involved.

On September 17 and 18, 1990, Martin–Marietta received anonymous telephone calls suggesting McElveen posed as Milligan for insurance purposes. At an investigative hearing held September 19, Milligan denied McElveen had used Milligan's insurance number and claimed a mistake had been made. Milligan explained he was mountain climbing with McElveen who fell from a cliff and was taken to a hospital. Milligan stated that in addition to treating McElveen, the hospital bandaged his leg and knee, as he had been "gouged up" while climbing. Milligan stated he presented his medical card only for himself. After the hearing, Milligan was fired.

During a September 20, 1990 conversation with an LCH representative, Milligan stated any LCH bill was not for him because he was not treated at the hospital. He further stated McElveen was treated in the emergency room for shin scrapes with peroxide and a bandage. Milligan claimed the emergency room nurse mistakenly recorded the wrong name. Milligan similarly told a VUMC representative he had not been treated there. Requesting assistance, Milligan told his union representative Jason Hill ("Hill") he was unaware of the reasons behind his Martin–Marietta termination. At Hill's request, Milligan prepared a written statement, which stated he accompanied a friend to Lewis County Hospital. Milligan repeated the same story he had told at the previous hearing, stating he had no idea how someone else had been treated with his insurance card. Martin–Marietta denied the union grievance filed on Milligan's behalf. After learning Benny Milligan worked during the period the insurance company received claims, Connecticut General insurance company, NASA's insurance provider, terminated payment on checks to several medical providers.

On November 27, 1990, Federal Agent Ronald Wilson ("Wilson") interviewed the Milligans. Both signed written waivers of their constitutional rights. Benny Milligan told Wilson that on July 8, he, his wife, and McElveen drank heavily and went to a waterfall. Milligan said he later discovered McElveen missing, and found him at the bottom of the waterfall. Milligan stated he carried McElveen to the car and drove him to a hospital. Milligan denied referring to McElveen as "Benny Milligan" or giving McElveen his medical information. He said a nurse asked him for medical information, but his memory was unclear due to intoxication.

Tamara Milligan stated due to intoxication she remembered nothing about July 8. She later stated she remembered McElveen's fall and transporting him to the hospital. She also told Wilson she signed hospital forms only for her husband's treatment, and denied both referring to McElveen as her husband and visiting the Maury Regional Hospital. Benny Milligan later admitted he lied during the series of inquiries, including those of Martin–Marietta management, Hill and Wil-

son. Tamara Milligan similarly admitted she lied to Wilson.

On August 14, 1991, a federal grand jury for the Middle District of Tennessee charged Benny Milligan, Tamara Milligan and James McElveen with four counts of mail fraud, one count of wire fraud, and one count of conspiracy. A jury convicted each of the Milligans on all counts, but found McElveen guilty on five counts. The district court sentenced Benny Milligan to nine months incarceration, McElveen to seven months incarceration, and Tamara Milligan to four months of home detention, and ordered all to make restitution of $41,107.75. This timely appeal followed.

## II.

### A.

Appellants first argue the evidence was insufficient to overcome their defense that it was legally necessary for them to commit conspiracy and mail and wire fraud to avoid greater harm, otherwise known as the "necessity defense." The jury rejected the defendants' necessity defense and convicted them of mail and wire fraud. We agree.

In determining whether evidence sufficiently supports a defendant's conviction, appellate courts must defer to the jury decision if it is supported by substantial and competent evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Tilton,* 714 F.2d 642, 645 (6th Cir.1983). This circuit defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *United States v. Conti,* 339 F.2d 10, 13 (6th Cir.1964); *Battjes v. United States,* 172 F.2d 1, 5 (6th Cir.1949). This Court must view all evidence in the light most favorable to the government, and draw reasonable inferences in the government's favor. *Glasser,* 315 U.S. at 80, 62 S.Ct. at 469; *Tilton,* 714 F.2d at 645; *Battjes,* 172 F.2d at 5. If this review establishes there was "sufficient competent evidence on the record to justify a rational juror's conclusion that every element of the offense has been established beyond a reasonable doubt, the conviction must be affirmed." *Tilton,* 714 F.2d at 645–646.

Our review of the entire record reveals substantial evidence existed on which to base the jury's rejection of defendants' necessity defense. To establish a necessity defense, a defendant must show: (1) he was under an unlawful and "present, imminent, and impending" threat which induces "a well-grounded apprehension of death or serious bodily injury;" (2) he did not recklessly or negligently place himself "in a situation in which it was probable" he would be forced to choose criminal conduct; (3) he had no "reasonable legal alternative to violating the law" or opportunities to refuse to do the criminal act and avoid the threatened harm; and (4) a direct causal relationship is reasonably anticipated between the crime and the avoidance of the threatened harm. *United States v. Singleton,* 902 F.2d 471, 472 (6th Cir.1990), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990); *United States v. Gant,* 691 F.2d 1159, 1162–63 (5th Cir.1982). In this case, the analysis turns on whether the defendant had "no alternative—either before or during the event—to avoid violating the law." *Singleton,* 902 F.2d at 473. The defense of necessity is not applicable when one has a choice of several courses of action, *Gant,* 691 F.2d at 1164, unless defendants show they pursued their alternatives or such alternatives were foreclosed. *Id.* Here, the defendants had the choice to reveal McElveen's uninsured status and request treatment, and they failed to pursue this alternative. The choice was not foreclosed, because each of the treating facilities had policies requiring treatment of uninsured patients.

The defendants nonetheless argue the health care system reserves the best medical services for the insured and relegates uninsured patients to marginal care. Thus, according to the defendants, had they not concealed his uninsured status, McElveen would not have received the necessary treatment. Here, however, defendants have not satisfied a second component of the necessity defense. A corollary to the requirement that defendant have no reasonable alternative to the crime is that defendant cease the criminal offense as soon as a safe opportunity arises. *Singleton,* 902 F.2d at 473. Defendants failed to discontinue their conspiracy and

fraud by revealing their deception once McElveen's condition stabilized. Further, after others discovered the deception, the defendants failed to come forward and explain their dilemma and chose instead to deny their fraud. Milligan lied to a representative of his employer, his union representative, hospital officials, and law enforcement officers. These lies converted an unplanned reaction to a desperate situation into a fraudulent scheme and conspiracy to avoid payment of medical bills.

Therefore, we find the government's proof was sufficient to justify the jury's conclusion that the defendants failed to establish a necessity defense.

### B.

Appellants next argue the district court erred in instructing the jury that necessity is not a defense to the continuing offense of conspiracy. Defendants claim giving the necessity defense jury instruction as to the fraud but not conspiracy charge was "so confusing that it effectively negated the value of the necessity charge given." We disagree.

 This court reviews the jury charge in its totality to determine whether it fairly and adequately submits the issues and law to the jury. *United States v. Williams,* 952 F.2d 1504, 1512 (6th Cir.1991). A defendant must produce sufficient evidence concerning each element to warrant an instruction on justification to the jury, *United States v. Paolello,* 951 F.2d 537, 543 (3rd Cir.1991), and a judgment may only be reversed if the instructions, viewed in their totality, were confusing, misleading or prejudicial. *Beard v. Norwegian Caribbean Lines,* 900 F.2d 71, 72–73 (6th Cir.1990).

 In this case, the district court properly denied a necessity instruction as to the conspiracy charge. Such denial did not result in an instruction as to the fraud charge which was confusing, misleading or prejudicial.

First, defendants failed to produce sufficient evidence concerning each element of conspiracy to warrant a jury instruction on necessity. As indicated above, after McElveen received the medical care, any contin-

ued deception became a conspiracy to obtain free medical care with costs paid through Milligan's insurance. The conspiracy included lies to investigating officers months after the accident, at which point it was clear no emergency existed. There was never any cessation or disclosure of the crime upon the termination of the alleged necessity. Defendants failed to produce sufficient evidence concerning the requirement that they cease the criminal offense as soon as a safe opportunity arose, *Singleton,* 902 F.2d at 473, to warrant an instruction on necessity to the jury. *Paolello,* 951 F.2d at 543.

Second, recognizing the trial court limited the necessity instruction to the fraud charges, we find the instructions, viewed in their totality, were not confusing, misleading or prejudicial. Given that conspiracy is a continuing offense while fraud is not, it was reasonable to limit the necessity defense to fraud. There is no evidence the jury was unable to discern the difference between conspiracy and fraud, or the application of the necessity defense to fraud.

Because defendants failed to establish sufficient evidence to require an instruction on necessity as to conspiracy, and the instructions, viewed in their totality, were not confusing, misleading or prejudicial, we find that the jury charge fairly and adequately submitted the issues and law to the jury.

### C.

 Appellants next argue the evidence was insufficient to establish McElveen knowingly and voluntarily joined the conspiracy. For questions of the sufficiency of evidence, we must view the evidence in the light most favorable to the Government and determine whether any jury could have reasonably found McElveen voluntarily joined the conspiracy. *Tilton,* 714 F.2d at 645–646. To establish conspiracy, the government must prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy. *United States v. Butler,* 618 F.2d 411, 414 (6th Cir.) *cert. denied,* 447 U.S. 927, 100 S.Ct. 3024, 65 L.Ed.2d 1121 (1980). Proof of a formal agreement is unnecessary,

because acts done with a common purpose can establish an implicit agreement. *United States v. Ayotte,* 741 F.2d 865, 867 (6th Cir.), *cert. denied,* 469 U.S. 1076, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984). A tacit or mutual understanding among conspirators is sufficient to show conspiratorial agreement, and conspiracy may be inferred from relevant and competent circumstantial evidence, such as acts of the conspirators themselves. *United States v. Reifsteck,* 841 F.2d 701, 704 (6th Cir.1988); *United States v. Morado,* 454 F.2d 167, 174 (5th Cir.) *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). Once the existence of a conspiracy is established, slight evidence is sufficient to implicate a defendant. *United States v. Chambers,* 382 F.2d 910, 913 (6th Cir.1967). A defendant may be guilty of conspiracy despite possessing limited knowledge of the conspiracy's scope, details and membership. *Id.* A defendant, however, must know the purpose of the conspiracy. *Chambers,* 382 F.2d at 913.

 Immediately after the incident and throughout his treatment, McElveen furthered the conspiracy by responding to Milligan's name when addressed by doctors, staff, the Milligans and others at Lewis Community, Maury Regional and Vanderbilt Hospitals. McElveen also signed various forms as Milligan. These acts sufficiently established a tacit and mutual understanding between the Milligans and McElveen and show conspiratorial agreement.

Examining this evidence in the light most favorable to the government, we find a reasonable juror could find McElveen tacitly agreed to illegally pose as Milligan and receive free medical treatment under his name, with costs borne by Milligan's insurance.

### D.

 Appellants next argue the district court erred at sentencing in calculating restitution. To arrive at a loss figure for the scheme, the court used the medical bills to calculate an estimated loss of $41,000, and added five points to the base offense level. We find this calculation was proper.

Specifically, Milligan and McElveen assert the health care providers suffered no loss because they claim they would have rendered the same care to McElveen regardless of insurance status or inability to pay. According to defendants, this loss would have occurred regardless of the fraud. We review a district court's interpretation and application of the sentencing guidelines *de novo. United States v. Mullins,* 992 F.2d 1472, 1478–79 (9th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 2997, 125 L.Ed.2d 691 (1993). After determining the meaning and scope of the guidelines, we review the district court's factual findings underlying the sentence for clear error. *See United States v. Robinson,* 898 F.2d 1111, 1116 (6th Cir.1990). Loss need not be determined with precision. *See* U.S.S.G. § 2F1.1 comment (n. 8). The guidelines require a district court to make a reasonable estimate, which may be founded on general factors such as the nature and duration of the fraud. *Id.*

The sentencing guidelines define a product's fair market value as the value of the victim's loss, U.S.S.G. § 2B1.1, cmt. (n. 2), and in situations involving fraud, to determine fair market value the district court may consider probable or intended loss. *See* U.S.S.G. § 2F1.1 cmt. (n. 7); *see also Mullins,* 992 F.2d at 1479; *United States v. Simpson,* 995 F.2d 109, 112 (7th Cir.1993). Here, the district court found the defendants intended to obtain medical services regardless of cost, and thus the loss equaled the cost of equivalent medical services to general, paying consumers, rather than the amounts paid by indigents. Although the hospitals admit they would have serviced McElveen absent insurance, we are not prepared to hold McElveen was *entitled* to free health care. McElveen made no arrangements to pay for his care and the fraud deprived the hospitals the opportunity to arrange an alternative payment schedule for the services.

Thirty-seven million Americans, or 16.6% of the non-elderly population, are without health insurance. Fritz, *U.S. Cautiously Awaits Clinton Health Program,* L.A. Times, Sept. 19, 1993, at A1. Eighty-three percent of the uninsured are either employed (often as low-wage workers, like McElveen) or children. *Id.* More than two in five are minori-

ties. *Id.* To many Americans, rising health care costs make the purchase of insurance prohibitively expensive. This court does not suggest that health based on wealth is a wise policy. We sympathize with those forced into bankruptcy merely because they become ill.

This court, however, can not condone defrauding hospitals with policies sympathetic toward the uninsured. There is a need to deter those who might otherwise believe they are free to defraud charitable policies with minimal penalty under the sentencing guidelines. The hospitals which provide medical care to patients who are presently unable to pay should not be subject to less protection by the sentencing guidelines. In 1991, hospitals provided $13.4 billion worth of medical care to Americans without compensation. *Id.* Many hospitals have shouldered the injustices of a sick health care system by providing health care without compensation. These institutions should not be punished by allowing persons who consciously. defraud health care providers to receive more lenient sentencing, thereby encouraging uninsured individuals to cheat the hand which heals them. Such a holding would discourage warmhearted contributions by unnecessarily exposing them to unfettered abuse.

The information relied on by the district court to determine the amount of loss and the five level increase is within the contemplation of the guidelines. Accordingly, we do not find the estimate of loss arrived at by the district court clearly erroneous.

### E.

Appellants next argue that the district court erred by ordering Benny and Tamara Milligan to pay restitution. The Milligans assert the restitution order was in error because the district court incorrectly found they would be able to pay.

■ In ordering restitution, the sentencing court must consider the loss suffered by the victim, the defendant's financial resources, the financial needs and earning potential of the defendant and her dependents, and other factors the court deems appropriate. 18 U.S.C. § 3580(a); *United States v.*

*Purther*, 823 F.2d 965, 968–69 (6th Cir.1987). A defendant's indigence, however, does not bar the issuance of an order of restitution, for the condition of indigence may be changed by a defendant's future assets and earnings. *Purther*, 823 F.2d at 970; *United States v. Mounts*, 793 F.2d 125, 128 (6th Cir.1986), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). Once a sentencing court considers these factors, it has "very broad discretion in setting the terms of the restitution order." *Purther*, 823 F.2d at 969; *United States v. Padgett*, 892 F.2d 445, 449 (1989). We, therefore, review restitution orders under an abuse of discretion standard. *United States v. Bailey*, 975 F.2d 1028, 1031 (4th Cir.1992).

■ After considering the Milligans' financial condition, the district court tailored a restitution order to the Milligans' ability to pay. The district court recognized the defendants were young, regularly employed and capable of earning a living, and stated the Milligans were required to pay only that which they are capable of paying and were not to be deprived of the necessities of life. The district court delayed restitution payments until Milligan's release from incarceration. Because the district court comprehensively considered the Milligan's financial condition, we find no abuse of discretion in imposing restitution.

### F.

Appellants also argue the district court erred by enhancing McElveen's offense level for more than minimal planning. The district court found McElveen's participation warranted the two level enhancement for more than minimal planning. We agree.

■ An increase in a defendant's offense level by 2 is required if his offense involved more than minimal planning. U.S.S.G. § 2F1.1(b)(2). 'More than minimal planning' exists in situations involving: (1) more planning than is typical for commission of the offense in simple form; (2) significant affirmative steps were taken to conceal the offense; or (3) repeated acts over a period of time, unless it is clear that each instance was purely opportune. *United States v. Ivery,*

999 F.2d 1043, 1046 (6th Cir.1993). We review such an enhancement for clear error. *United States v. Muhammad,* 948 F.2d 1449, 1455 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1239, 117 L.Ed.2d 472 (1992).

■ In the instant case, McElveen's scheme involved more than minimal planning. McElveen took significant affirmative steps to conceal the conspiracy, such as responding to personnel and signing various forms as "Benny Milligan" at Lewis, Maury and Vanderbilt Hospitals. Second, the concealment of the conspiracy included repeated acts furthering the conspiracy. Consequently, we find the sentencing court's two level enhancement for more than minimal planning was not clearly erroneous.

### G.

■ Finally, Appellants argue the sentencing court erred by failing to reduce McElveen's offense level for acceptance of responsibility. We disagree.

A two-level reduction in offense level is allowed when a defendant clearly recognizes and affirmatively accepts personal responsibility for his criminal conduct. U.S.S.G. § 3E1.1(a). Among the criterion for determining whether a defendant accepted responsibility are: (1) "voluntary termination or withdrawal from criminal conduct or associations;" (2) "voluntary payment of restitution prior to adjudication of guilt;" and (3) "voluntary surrender to authorities promptly after commission of the offense." U.S.S.G. § 3E1.1, cmt. (n. 1). A district court's determination that a defendant has accepted responsibility is a factual question which is to be affirmed by reviewing courts unless clearly erroneous. *United States v. Snyder,* 913 F.2d 300, 305 (6th Cir.1990), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991); *United States v. Luster,* 889 F.2d 1523, 1525 (6th Cir.1989); *United States v. Wilson,* 878 F.2d 921, 923 (6th Cir.1989).

The district court specifically found:

It served (McElveen's) interest just to lay low and hope the matter didn't become unraveled. He didn't step up to the plate and accept responsibility. He didn't disclose the truth of the matter long after any supposed necessity had evaporated and the services had been rendered. He got all

the services and left and never made anything in the way of a truthful disclosure.

Recognizing McElveen's actions, we can hardly deem the sentencing court's acceptance of responsibility determination clearly erroneous. McElveen failed to voluntarily pay restitution to those who provided him medical care. McElveen failed to voluntarily surrender to authorities promptly after his receipt of medical care. Additionally, McElveen failed to voluntarily terminate or withdraw from the criminal conduct and take steps that might disclose the illegal activities.

Given the facts at hand the district court did not commit clear error by denying McElveen a reduction for acceptance of responsibility.

### III.

For the foregoing reasons we **AFFIRM** the jury's findings and the judgment of the Honorable Thomas A. Higgins, United States District Judge for the Middle District of Tennessee.

RYAN, Circuit Judge, concurring separately.

I concur in all of my brother's opinion except part II.D., as to which I concur only in the conclusion that the district court did not err in calculating restitution.